Alan M. Mansfield, SBN: 125998
WHATLEY KALLAS LLP
amansfield@whatleykallas.com
1 Sansome Street, 35th Floor PMB #131
San Francisco, CA  94104
Tel: (619) 308-5034
Fax: (888) 341-5048

Joe R. Whatley, Jr.
(*Pro Hac Vice application to be filed*)
jwhatley@whatleykallas.com
Edith M. Kallas
(*Pro Hac Vice application to be filed*)
ekallas@whatleykallas.com
WHATLEY KALLAS, LLP
152 W. 57th Street, 41st Floor
New York, NY 10019
Tel: (212) 447-7060
Fax: (800) 922-4851

Henry C. Quillen
(*Pro Hac Vice application to be filed*)
hquillen@whatleykallas.com
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851

**Attorneys for Plaintiff**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JACKSONVILLE POLICE OFFICERS AND FIRE FIGHTERS HEALTH INSURANCE TRUST, on behalf of itself and all others similarly situated; <br><br> Plaintiff, <br><br> v. <br><br> GILEAD SCIENCES, INC., CIPLA LTD., CIPLA USA INC., <br><br> Defendants. | CASE NO. <br> **CLASS ACTION COMPLAINT** <br> (1) Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 <br> (2) Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.* <br> (3) Violation of Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL") <br> (4) Restitution, Money Had and Received, Unjust Enrichment, Quasi-Contract and/or Assumpsit <br> (5) Violation of State Law <br> **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff, on behalf of itself and all others similarly situated, upon personal knowledge as to its own acts and status as specifically identified herein, and otherwise upon information and belief based upon investigation as to the remaining allegations, which allegations are likely to have support after a reasonable opportunity for investigation and discovery, hereby alleges as follows against Defendants:

## INTRODUCTION

1.     Over the years, Gilead Sciences, Inc. ("Gilead") has employed several unlawful strategies to stave off competition for its HIV medications. Many of these strategies have been the subject of various lawsuits. This lawsuit involves a strategy that has not yet been explored in depth: Gilead's large, unexplained payment to the generic drug manufacturer Cipla Ltd. and Cipla USA Inc. (collectively "Cipla") in return for Cipla's agreement not to compete against the drug Truvada by selling a copackaged drug containing the active ingredients in Truvada. This payment likely came in the form of a license to produce another drug, Atripla, a license to produce drugs for Hepatitis C in India, or both. Such a payment is unlawful. Gilead's agreement with Cipla kept the price of Truvada at anticompetitive levels and harmed the health plans that pay for this drug on behalf of their members.

## PARTIES

2.     Plaintiff Jacksonville Police Officers and Fire Fighters Health Insurance Trust is a health insurance trust organized under the laws of the State of Florida, with its principal place of business at 625 Stockton Street, Jacksonville, Florida 32204. Since the beginning of 2020, Plaintiff has spent approximately $15,000 on Truvada for the benefit of its members.

3.     Defendant Gilead is a Delaware corporation with its principal place of business at 333 Lakeside Drive, Foster City, California 94404.

4.     Defendant Cipla Ltd. is a corporation organized and existing under the laws of India, with its principal place of business at Cipla House, Peninsula Business

CLASS ACTION COMPLAINT

Park, Ganpatrao Kadam Marg, Lower Parel, Mumbai 400013, India.

5.     Defendant Cipla USA Inc. is a Delaware corporation with its principal place of business at 1560 Sawgrass Corporate Parkway, Suite 130, Sunrise, Florida 33323. Cipla USA Inc. is a subsidiary of Cipla Ltd.

## JURISDICTION

6.     This Court has jurisdiction over Count I of this complaint pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

7.     This Court has jurisdiction over Count I of this complaint pursuant to 28 U.S.C. § 1337 because it arises under an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

8.     This court has jurisdiction over Counts II–V of this complaint pursuant to 28 U.S.C. § 1367(a) because they are so related to Count I that they form part of the same case or controversy under Article III of the United States Constitution.

9.     This Court has jurisdiction over Counts II-V this complaint pursuant to 28 U.S.C. § 1332(d) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; a member of a class of plaintiffs is a citizen of a state different from any defendant; and the number of members of all proposed plaintiff classes in the aggregate is greater than 100.

## VENUE

10.     Venue is proper in this district pursuant to 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. § 1391 because Defendant Gilead resides in this District, is an inhabitant of this district and may be found here, and because it transacts substantial business in this District. Defendants Cipla Ltd. and Cipla USA Inc. transact substantial business in this District, and Cipla USA Inc. has acted as an agent for Cipla Ltd. with respect to some of the allegations of this complaint, as described below. Moreover, a substantial part of the events or omissions giving rise to the claim occurred in this District.

**INTRADISTRICT ASSIGNMENT**

11.　Assignment to this division is proper because Defendant Gilead resides in this division and because a substantial part of the events or omissions giving rise to the claim occurred in this division. In the alternative, this antitrust case may be assigned on a district-wide basis pursuant to Local Rule 3-2(c).

**FACTUAL ALLEGATIONS**

**I.　Regulatory Background**

12.　The Food and Drug Administration ("FDA") must approve all new drugs before a company can begin sales in the United States. 21 U.S.C. § 355(a). To obtain FDA approval, the company must file a New Drug Application (NDA), which contains information about the safety and efficacy of the drug, the components of the drug, and any patents issued on the composition of the drug or methods for its use. *Id.* § 355(b)(1). The FDA publishes this information in the directory of *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly known as the "Orange Book."

13.　As generic drugs offer significant cost savings, Congress passed the Hatch–Waxman Act in order to provide an additional streamlined FDA approval process. See Pub. L. No. 98–417, 98 Stat. 1585 (1984). Under the Hatch–Waxman Act, a generic manufacturer can file an Abbreviated New Drug Application (ANDA), and show that the generic drug is biologically and pharmaceutically equivalent to an FDA-approved brand-name drug. 21 U.S.C. § 355(j)(2)(A). The generic manufacturer does not need to conduct time-consuming and costly clinical trials anew, but can rely on the scientific findings of safety and effectiveness included in the brand-name drug's NDA. That said, the generic manufacturer must invest significant resources in developing a drug that is biologically and pharmaceutically equivalent.

14.　In order to protect the brand-name drug manufacturer's patent rights, the generic manufacturer must make one of four "paragraph" certifications: (i) that

no patent for the brand-name drug has been filed with the FDA (Paragraph I); (ii) that the patent for the brand-name drug has expired (Paragraph II); (iii) that the patent for the brand-name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (Paragraph III); or (iv) that the patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (Paragraph IV). 21 U.S.C. § 355(g)(2)(A)(vii).

15.     After filing an ANDA with a Paragraph IV certification, the generic manufacturer must send notice to the patent holder. 21 U.S.C. § 355(j)(2)(B). This notice is treated as actual infringement, and it triggers a forty-five day period during which the patent holder may file a patent infringement lawsuit before the generic reaches the market. Id. § 355(j)(5)(B)(iii). If the patentee files suit, the FDA stays the ANDA for the lesser of thirty months or entry of final judgment of non-infringement or invalidity. Id. During this stay, the FDA can grant tentative approval. § 355(j)(5)(B)(iv)(II)(dd).

16.     The first party to file a Paragraph IV ANDA receives a special benefit: a period of 180 days where the FDA will not grant any competing ANDA. 21 U.S.C. § 355(j)(5)(B)(iv). This exclusivity period can be "worth several hundred million dollars" to the generic drug manufacturer, who typically earns most of the profits on the generic drug during this time. *FTC v. Actavis, Inc.*, 570 U.S. 136, 144 (2013). However, this only excludes other generic manufacturers, not the brand-name drug manufacturer, who can always release a generic. See 21 U.S.C. § 355(j)(5)(B)(iv)(I). Generic drugs that are released by the brand-name drug manufacturer are called "authorized generics," which allow the brand-name drug manufacturer to recover some of the sales and profits it would otherwise lose when an ANDA applicant begins to sell the generic drug.

17.     There are circumstances, however, in which the first party to file a Paragraph IV ANDA can forfeit its 180-day exclusivity period. These include failing

to market the drug within a certain period of time, entering into an agreement with the patent holder that violates the antitrust laws, and expiration of the patents that are the subject of the Paragraph IV certification. 21 U.S.C. § 355(j)(5)(D)(i).

## II.   HIV Prevention and Treatment

18.   The human immunodeficiency virus (HIV) causes HIV infection and acquired immunodeficiency syndrome (AIDS). HIV comes in two types, HIV-1 and HIV-2. In the United States, HIV-1 is far more common, and this complaint will use the term "HIV" to refer to HIV-1. Scientists have developed various drugs to treat HIV infection, prevent it, or both. Among these drugs are tenofovir disproxil fumarate (TDF), emtricitabine, and efavirenz. These drugs are typically prescribed in combination with each other or with other drugs.

19.   Gilead is the holder of NDAs for multiple drugs that include TDF, emtricitabine, efavirenz, or a combination of them. Among them are:

   a.   Viread® tablets, which contain 300 mg of TDF.

   b.   Emtriva® tablets, which contain 200 mg of emtricitabine. Gilead did not invent emtricitabine. It was patented by researchers at Emory University, who assigned the patents to Gilead.

   c.   Truvada® tablets, which contain 200 mg of emtricitabine and 300 mg of TDF (the same dosages of these drugs as Emtriva® and Viread® contain).

   d.   Atripla® tablets, which contain 600 mg of efavirenz, 200 mg of emtricitabine, and 300 mg of TDF (the same dosages of the latter two drugs as Emtriva® and Viread® contain). Gilead does not own the patents to efavirenz, which are licensed by their owner, Merck Sharp & Dohme (Merck) to Bristol-Myers Squibb Company (Bristol-Myers). Atripla® was formulated by a joint

venture between Gilead and Bristol-Myers.[1]

20. On July 16, 2012, the FDA approved Truvada for pre-exposure prophylaxis (PrEP) in combination with safer sex practices to reduce the risk of sexually acquired HIV infection in adults at high risk. Studies have shown that Truvada significantly reduces the risk of contracting HIV. Truvada is the only drug approved for PrEP in the United States.

21. On March 10, 2016, the FDA approved Truvada in the following emtricitabine/TDF dosage strengths for the treatment of HIV infection in pediatric patients: 167mg/250mg, 133mg/200mg, and 100mg/150mg.

22. Truvada is very profitable for Gilead. In 2018, the price for a month's supply was about $2,000. According to the group ACT UP New York, a month's supply of Truvada costs Gilead about $6 to produce. Gilead's sales of Truvada totaled more than $2.6 billion in the United States in 2018. These figures include Truvada used for treatment of HIV and PrEP.

23. Atripla is also very profitable. In 2018, the retail price for a month's supply of Atripla was about $3,400. Like Truvada, Atripla is relatively inexpensive to manufacture. In the developing world, the wholesale cost for a month's supply was less than $11 in 2015. Gilead's sales of Atripla totaled $967 million in the United States in 2018.

### III.   Patents on Emtricitabine, Truvada, and Atripla

24. To understand the allegations of this case, one must understand the concept of enantiomers of chemical compounds. As Gilead has explained in other litigation, "when a compound's 3-dimensional structure is not superimposable upon a compound that is its mirror image (like our left and right hands), these two compounds are referred to as 'enantiomers.'" Such a compound is called "chiral," a word that derives from the Greek word for "hand."

---

[1] For readability, this Complaint will omit the registered trademark symbol when referring to the names of drugs.

25.    Often, when a chiral compound is synthesized, both of its enantiomers are present in equal proportions. This is called a "racemic mixture" or a "racemate." Through various techniques, often one can treat a racemic mixture so that one enantiomer exists in a larger proportion than the other. This process is called "enantioenrichment." If only one enantiomer of the compound is present, the compound is "enantiomerically pure."

26.    Emtricitabine is one of two enantiomers of a compound whose name is abbreviated as β-FTC, specifically the enantiomer called "(–)-β-FTC." (The other enantiomer is called "(+)-β-FTC.")

27.    Gilead had rights in a patent that claims β-FTC (Patent No. 5,814,639, or the '639 Patent) and another that claims the use of β-FTC to treat HIV (Patent No. 5,210,085, or the '085 Patent). These patents covered β-FTC broadly; they did not limit their claims to a particular enantiomer. The '085 Patent expired in 2010, and the '639 Patent expired on September 29, 2015.

28.    Gilead also has rights in two other patents relating to emtricitabine: Patent No. 6,703,396 (the '396 Patent) and Patent No. 6,642,245 (the '245 Patent). The '396 Patent claims (–)-β-FTC (that is, emtricitabine), and the '245 Patent claims the use of (–)-β-FTC to treat HIV. The '396 Patent is scheduled to expire on March 9, 2021, and is also subject to a pediatric exclusivity period of six months beyond its statutory expiration date, which is scheduled to end on September 9, 2021. (A drug manufacturer who undertakes pediatric studies for a drug can be entitled to an additional six months of exclusive marketing beyond the expiration of any patents covering the drug.) The '245 Patent is scheduled to expire on November 4, 2020. The '245 patent is also subject to a pediatric exclusivity period of six months beyond its statutory expiration date, which is scheduled to end on May 4, 2021.

29.    Gilead also has rights in patents that cover the combination of TDF and emtricitabine in a single dosage form, which Gilead markets as Truvada. In litigation in Canada, a similar patent was held to be invalid because it was anticipated and

obvious. Additionally, Gilead has rights in patents that cover the combination of TDF, emtricitabine, and efavirenz in a single dosage form, which Gilead markets as Atripla.

### IV. Gilead Has Settled Litigation over Drugs Containing Emtricitabine with Large, Unjustified Reverse Settlement Payments.

30.     Gilead's patents covering emtricitabine, which is a component of Truvada, Atripla, and other drugs, have been under attack in the courts for a decade. While the patents suffer from glaring weaknesses, no case has ever been fully litigated. The reason why, as explained below, is that Gilead has given the defendants in these cases agreements of such great value that they amount to large, unjustified reverse settlement payments.

### A. Litigation with Teva Exposes the Weakness of the Emtricitabine Patents.

31.     In 2008, Teva Pharmaceuticals USA, Inc. or Teva Pharmaceutical Industries Ltd. (collectively, "Teva") filed an ANDA seeking approval to manufacture and sell tablets containing 200 mg of emtricitabine and 300 mg of TDF—a generic version of Truvada. In late 2009 or early 2010, Teva filed two more ANDAs: one seeking approval to manufacture and sell tablets containing 600 mg of efavirenz, 200 mg of emtricitabine, and 300 mg of TDF (a generic version of Atripla) and one seeking approval to manufacture and sell tablets containing 300 mg of TDF (a generic version of Viread). These ANDAs contained Paragraph IV certifications with respect to patents covering efavirenz, emtricitabine, and TDF.

32.     The holders of the patents at issue sued Teva for infringement. These claims for infringement eventually proceeded in three suits, all in the United States District Court for the Southern District of New York:

     a.   *Merck, Sharp & Dohme Corp. & Bristol-Myers Squibb Co. v. Teva Pharmaceuticals USA, Inc. & Teva Pharmaceutical Industries, Ltd.*, No. 10-cv-1851 (the "Teva efavirenz suit"). The plaintiffs alleged that Teva's manufacture and sale of generic Atripla would infringe their patents on efavirenz.

b.   *Gilead Sciences, Inc. v. Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., & Cipla Ltd.*, No. 10-cv-1796 (the "Teva TDF suit"). The plaintiff, Gilead, alleged that Teva's manufacture and sale of generic Viread would infringe its patents on TDF.

c.   *Gilead Sciences, Inc. & Emory University v. Teva Pharmaceuticals USA, Inc. & Teva Pharmaceutical Industries, Ltd.*, No. 08-cv-10838 (the "Teva emtricitabine suit"). The plaintiffs, including Gilead, alleged that Teva's manufacture and sale of generic Truvada would infringe their patents on emtricitabine.

33.   The Teva efavirenz suit proceeded as far as pretrial briefing before being settled. The terms of the settlement were confidential, but Teva never made any drugs containing efavirenz in the United States before the last of the patents at issue expired in 2018. Mylan, N.V. was the first company to launch a generic version of efavirenz, on February 1, 2018, and the FDA has now approved a total of four ANDAs for the manufacture and sale of 600 mg efavirenz tablets.

34.   The Teva TDF suit also proceeded as far as pretrial briefing before being settled. Most of the terms of the settlement were confidential, but Teva announced an exclusive launch of 300 mg TDF tablets (generic Viread) on December 15, 2017—shortly before expiration of the last relevant patents (and exclusivity periods) on TDF on January 25, 2018.

35.   The Teva emtricitabine suit was tried to a judge. It settled before closing statements.

36.   As described above, the issue in the Teva emtricitabine suit was this: given that β-FTC and its use to treat HIV were already patented, could Gilead obtain further patent protection for (–)-β-FTC and its use to treat HIV?

37.   Gilead's case started to unravel due to Gilead's failure to prepare for one of Teva's main arguments. Teva had asserted throughout the litigation that Gilead had engaged in "obviousness-type double patenting," which "prohibit[s] a party from obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001).

According to Teva, the '396 and '245 Patents (for (–)-β-FTC and its use) were not distinct enough from the '639 and '085 Patents (for β-FTC and its use) to merit additional patent protection. Obviousness-type double patenting can mean that claims in a later patent are "obvious over" claims in an earlier patent. It can also mean that claims in a later patent are "anticipated by" claims in an earlier patent. *Id.* at 968. The Court in the Teva emtricitabine suit referred to the latter as the "anticipation sub-theory of obviousness-type double patenting." Teva pursued both sub-theories—obviousness and anticipation—in its pretrial briefing. Gilead was taken off guard; its opening pretrial brief did not address the anticipation sub-theory at all. Gilead objected in a letter to the Court that Teva had not previously disclosed that it would rely on the anticipation sub-theory and should not be allowed to do so. The Court disagreed, stating, "Defendants' reliance on this sub-theory cannot have been unexpected to Plaintiffs."

38.     The Court's decision to allow Teva to proceed on the anticipation sub-theory gave Teva a clear path to a verdict in its favor. Gilead had argued in its pretrial briefing that to prevail on the obviousness sub-theory, Teva would have to establish that a "person of ordinary skill in the art" would have been motivated to prepare the (–)-β-FTC enantiomer, that (–)-β-FTC had unexpected properties, that it felt an unmet need, and many other facts. But to prevail on the anticipation sub-theory, Teva needed to show at most that a person of ordinary skill in the art would visualize the (–)-β-FTC enantiomer when presented with the chemical structure of β-FTC, and that such a person could obtain (–)-β-FTC without undue experimentation. The first requirement was undisputedly met (although Gilead argued that this was not dispositive). And Teva conclusively proved the second requirement at trial.

39.     On the first element, whether a person of ordinary skill in the art would visualize (–)-β-FTC, the Court was deeply skeptical of Gilead's main argument. Gilead did not dispute that a person of ordinary skill in the art would visualize (–)-β-FTC when presented with the chemical structure of β-FTC, but argued that pure

(–)-β-FTC was one of an infinite number of potential ratios of (–)-β-FTC and its enantiomer (+)-β-FTC. Therefore, Gilead contended, a person of ordinary skill in the art would see (–)-β-FTC as one member of an infinite universe, rather than something readily identified. When Gilead made this argument in its opening statement at trial, the Court (which did not challenge any part of Teva's opening statement) said,

> That's just a mathematical proposition, right? I mean if there's billions or millions, hundreds of millions of molecules, then I guess you might have one or two and then the balance all one and then everything in between. It's hard for me to see why that's a compelling argument, but we'll come to that.

Gilead's counsel tried to explain further, but the Court interrupted again:

> That's a mathematical proposition that basically there is infinity between point A and point B, so there will be an infinite number of stops along that chain. But I don't think -- it seems to me that's not really scientific argument that there are an infinite number of ratios that a scientist of ordinary skill in the art would be looking to experiment to see whether a ratio of 49.6 percent was better than a ratio of 49.7 percent, which might be better or worse than 47.2 percent. That just strikes me as illogical.

Gilead's counsel tried again, stating that "a person of ordinary skill in the art would not understand what ratio would be the ratio that might make the best compound." But the Court remained unconvinced:

> It would seem a person of ordinary skill in the art even in 1990 would look to separate into the pure forms to see what the efficacy of each was. And, presumably, that would be the starting point rather than start at points in the middle and then start, you know, bit by bit going to either end. So maybe in 1990 they weren't that smart, but it seems to me that that's what a person would logically do.

Gilead's counsel tried yet again, responding that "one of ordinary skill in the art would have to envisage all of the mixtures at once in his or her head. They would have to be able to envisage the full claim scope in their head, which is not possible for a person to do." The Court did not buy it: "All right. I guess we'll see. I'm not convinced, but we'll see."

40.     This exchange was a disaster for Gilead because it showed that the Court would not agree with Gilead's "infinite mixtures" theory unless trial testimony

showed that a person of ordinary skill in the art in 1990 would have been overwhelmed with that infinity of mixtures, rather than simply looking to separate β-FTC into its enantiomers, (–)-β-FTC and (+)-β-FTC. After a full trial, no testimony remotely supported such a proposition. In fact, witnesses for Gilead and Teva both testified that a person of ordinary skill in the art would have readily visualized (–)-β-FTC after seeing the structure of β-FTC, and that separating and testing enantiomers was common practice. The Court also admitted evidence that the FDA encouraged scientists to separate and test enantiomers of chiral compounds, and that the inventors of β-FTC separated the enantiomers of analogous drugs at the request of the drug company Glaxo. Had the case gone to a verdict, Teva likely would have prevailed on this element of its anticipation sub-theory.

41.     On the other element of its anticipation sub-theory—whether a person of skill in the art could obtain (–)-β-FTC without undue experimentation—Teva elicited powerful evidence that put the lie to a narrative Gilead had promoted throughout the case. Before trial, Gilead claimed that real-world experience had shown that separating the enantiomers of β-FTC required a very high amount of time and ingenuity. Gilead's pretrial brief asserted that "the inventors themselves attempted five of those methods [of separation] during their research (all but one of which failed) before settling on enzymatic resolution." But one of the inventors admitted at trial that enzymatic resolution was the first method he tried, and he was able to separate the enantiomers with the very first enzyme he tried, pig liver esterase. This was not just an amazing coincidence; the evidence showed that enzymatic resolution was a commonly used method at the time, and the inventor was sure enough that it would work that in the patent application for β-FTC, he listed it as a method for separation even before trying it. Gilead also claimed before trial that the company BioChem took more than a year to separate the enantiomers of BCH-189, a compound similar to β-FTC. That assertion turned out to be based on Gilead's misunderstanding of the evidence. In fact, a technician at BioChem, who had never

before attempted to separate enantiomers, testified that she successfully did so with BCH-189 in "less than 15 days of laboratory time."

42.    Gilead tacitly recognized the severe damage the BioChem evidence did to its case by attempting in its post-trial brief to supplement the record with two new exhibits that supposedly put this evidence "in context." The Court rejected this attempt, stating, "The evidentiary phase of trial closed on October 28, 2013. Accordingly, the Court will not consider any new exhibits introduced through post-trial submissions, or any arguments or findings of fact relying on such exhibits." Following this ruling, Gilead had little hope of prevailing on the second element of the anticipation sub-theory. Thus, it was likely that Gilead would lose the case, and its patents on (–)-β-FTC and its use would be declared invalid.

43.    Gilead's arguments against the obviousness sub-theory fared no better. Here, the parties contested whether in light of the patents for β-FTC and its use, it would be obvious to a person of ordinary skill in the art to try to obtain (–)-β-FTC, and whether doing so would involve undue experimentation. As described above, Teva would have prevailed on the second element, as the inventors of β-FTC obtained (–)-β-FTC on their first try, using well-known methods, and a technician at BioChem did the same with a β-FTC analogue in less than 15 days. Gilead claimed, however, that the person of ordinary skill in the art would not have been motivated to obtain (–)-β-FTC for various reasons. This was highly implausible because in 1987, three years before (–)-β-FTC was obtained, the FDA issued guidance stating that enantiomers should be separated and may need to be tested:

> When the NDS [i.e., new drug substance] is asymmetric (e.g., contains one or more chiral centers, or has cis-trans or other types of isomers), the sponsor should ideally (and prior to the submission of an IND [i.e., investigational new drug]) have either separated the various potential stereoisomers of the NDS or synthesized them independently. Physical/chemical information about each stereoisomer should be provided (in detail), or may be requested. Individual stereoisomers may need to be studied for pharmacological and toxicological properties (and/or for safety and efficacy).

(Stereoisomers are molecules that have the same sequence of atoms but differ in

their three-dimensional structure. Enantiomers are a type of stereoisomer.) Gilead had no real response to this evidence. Gilead had planned to call as a witness a former FDA employee who intended to testify that this guidance notwithstanding, the FDA had no policy in 1990 concerning enantiomers. But her testimony was excluded before trial because Gilead waited too late to disclose her. Moreover, the evidence at trial showed that the separation and study of enantiomers was a regular practice as early as the 1970s, and the development of single-enantiomer drugs was standard practice in the pharmaceutical industry by 1990. And while Gilead had claimed that a person of ordinary skill in the art would have viewed (+)-β-FTC, not (–)-β-FTC, as the more obvious candidate for development, Gilead's own expert and fact witnesses agreed that such a person would have tested both before rejecting either of them.

44.     The presentation of evidence in the Teva emtricitabine suit ended on October 28, 2013. At that time, Teva had a strong likelihood of succeeding on both sub-theories of obviousness-type double patenting. On December 19, 2013, the Court ordered the parties to give summations on February 14, 2014. The day before summations, the parties informed the Court that they had reached a settlement in principle. Summations were canceled, and a stipulated dismissal was entered on April 30, 2014. No terms of the settlement were disclosed to the public, although the dismissal did state that each party would bear its own costs, expenses, and attorneys' fees.

45.     On May 8, 2019, more than five years after the case was dismissed, Gilead announced that Teva will be able to launch generic versions of Truvada and Atripla on September 30, 2020.

### B.     Gilead Settles Emtricitabine Litigation with Cipla Shortly After the Teva Settlement.

46.     In 2007, Cipla Ltd. submitted an ANDA in which it sought to market a generic version of Viread. The ANDA contained a Paragraph III certification,

indicating that Cipla Ltd. would wait until the expiration of the patents on Viread before marketing a generic version. The ANDA was tentatively approved in April 2009. In 2009, Cipla Ltd., through its agent Cipla USA, Inc., submitted ANDAs in which it sought to market generic versions of Emtriva, Truvada, and Atripla. All three ANDAs contained Paragraph III certifications. The ANDAs for Emtriva, Truvada, and Atripla were tentatively approved in March 2011, February 2014, and February 2012, respectively.

47.     On July 18, 2012, Cipla informed Gilead that it had amended its ANDA for Emtriva to include a Paragraph IV certification for the '245 and '396 Patents, the same patents on emtricitabine at issue in the Teva emtricitabine suit. Twelve days later, Cipla informed Gilead that it had amended its ANDA for Viread to include a Paragraph IV certification for four patents relating to TDF, the only active ingredient in Viread. On August 20, 2012, Gilead filed two suits against Cipla Ltd., one for infringing the emtricitabine patents, and one for infringing the TDF patents. The cases, *Gilead Sciences, Inc. v. Cipla Ltd.*, No. 1:12-cv-6350 (S.D.N.Y.) (the "Cipla emtricitabine suit") and *Gilead Sciences, Inc. v. Cipla Ltd.*, No. 1:12-cv-6351 (S.D.N.Y.) (the "Cipla TDF suit") were filed in the same court and assigned to the same judge as the Teva emtricitabine suit.

48.     Gilead and Cipla had completed all or nearly all discovery in both cases by June 26, 2014, when they asked the Court to stay the litigation so that the parties could discuss settlement. This was less than two months after the dismissal of the Teva emtricitabine suit. On July 28, 2014, the parties informed the Court that they had reached a settlement, and the cases were dismissed the next day. As in the Teva emtricitabine suit, no terms of the settlements were disclosed to the public, although the dismissals did state that each party would bear its own costs, expenses, and attorneys' fees. The letters requesting dismissal, which were substantially identical, did not disclose details of the settlements but did refer to a "Settlement and License Agreement."

49.    After the settlements, Cipla amended its ANDA for Atripla to include a Paragraph IV certification for patents covering emtricitabine (including the '245 and '396 Patents) as well as patents covering the combinations of TDF, emtricitabine, and efavirenz in Atripla. Cipla notified Gilead of its Paragraph IV certification, and Gilead did not file suit for infringement. Cipla received tentative approval of its ANDA for Atripla on March 22, 2016. As of August 14, 2018, all of the remaining patents subject to Paragraph III certification expired, including periods of pediatric exclusivity. Cipla received final approval of its ANDA for Atripla on June 3, 2019, but it has not marketed a generic version of Atripla in the United States.

50.    Cipla received approval for its ANDA for Emtriva on July 2, 2018. Cipla has not marketed a generic version of Emtriva in the United States.

51.    Several facts lead to the conclusion that Gilead made a large, unexplained reverse payment to Cipla as part of its settlement of its cases against Cipla, consisting of valuable consideration in exchange for Cipla's agreement not to compete with Gilead except on terms that Gilead dictated. By keeping all terms of its settlement agreements confidential, Gilead has prevented the public from knowing exactly what form this consideration took, but the facts of the case suggest that it at least included a license to manufacture a generic version of Atripla, a license to manufacture drugs for hepatitis C, or both. Such a settlement agreement would have been entered into in the State of California because Gilead's headquarters is there.

52.    First, the parties had completed or substantially completed discovery when they settled. Given that Cipla had not agreed to settle for Gilead's anticipated future litigation expenses before discovery, when those expenses were higher and Cipla's path to victory was less clear (because the Teva emtricitabine suit had not been tried yet), it would have been irrational for Cipla to settle after discovery for consideration equal to Gilead's anticipated future litigation expenses, when those

expenses were lower and Cipla had seen from the Teva suit that it could likely prevail on its challenge to the patents on emtricitabine.

53.     Second, the parties requested a stay in order to discuss settlement on June 26, 2014, less than two months after the stipulated dismissal of the Teva emtricitabine suit. The timing suggests that the weakness of the emtricitabine patents, which was revealed in the Teva emtricitabine suit, influenced Gilead's decision to settle the Cipla emtricitabine suit.

54.     Third, when the Cipla emtricitabine suit settled, the FDA had tentatively approved ANDAs for Emtriva from Aurobindo and Matrix. Because Cipla was the first to submit an ANDA for Emtriva with a Paragraph IV certification, the FDA could not issue final approval for any other ANDA until 180 days after Cipla had begun marketing a generic version of Emtriva. Thus, Gilead had additional incentive to compensate Cipla to delay its marketing of a generic version of Emtriva because doing so would automatically delay the entry of a generic version of Emtriva from at least two other manufacturers.

55.     Fourth, Cipla's ANDAs for Viread and Emtriva threatened not only the sales of those two drugs, but also the sales of Truvada. Cipla's decision to challenge the patents on Viread and Emtriva almost simultaneously, without challenging the separate patents on Truvada, would have indicated to Gilead that Cipla intended to sell co-packaged TDF and emtricitabine to compete with Truvada. (See Paragraphs 87–95 below for a discussion of co-packaged drugs and their competitive threat to Truvada.) Gilead's incentive to compensate Cipla for dropping its challenge to the TDF and emtricitabine patents would have gone beyond the desire to preserve its profits from Viread and Emtriva. Moreover, even if the Viread patents were ultimately held to be valid, Cipla could still have marketed a co-packaged TDF/emtricitabine product as early as January 2018 if it could successfully challenge the patents on emtricitabine, because that is the month when the last patents on TDF expired.

---

56.     Fifth, Cipla apparently agreed not to market a generic version of Emtriva in exchange for a license to market a generic version of Atripla before its patents expire, a license to manufacture drugs for hepatitis C, or both. This conclusion is based on five facts:

    a.     Cipla's ANDA for a generic version of Emtriva was approved on July 2, 2018, but Cipla has not begun to market such a drug or announced plans to do so.

    b.     By staying out of the market with emtricitabine, Cipla is giving up the period of time in which such a drug would be most valuable. Emtricitabine has relatively little commercial value as a stand-alone drug. For the first quarter of 2019, Gilead's United States revenue from "Other HIV" drugs, a category that includes Emtriva (i.e., emtricitabine) and the drug Tybost, totaled $11 million. For comparison, Truvada's revenue was $551 million. But if co-packaged with TDF (generic Viread), emtricitabine could compete with Truvada, opening a large market to Cipla. That competition will become more difficult in September 2020, when Gilead will allow Teva to market a generic version of Truvada, and more difficult still when other manufacturers introduce generic versions of Truvada in 2021. Cipla would be behaving irrationally to forgo sales of a co-packaged emtricitabine/TDF drug in the period from 2018 to 2021, when doing so would be most profitable, unless it received significant concessions in return.

    c.     When Cipla amended its ANDA for Atripla to include Paragraph IV certifications for patents covering emtricitabine (including the '245 and '396 Patents), as well as patents covering the combinations of TDF, emtricitabine, and efavirenz in Atripla,

Gilead did not sue for infringement. This strongly implies that the settlement agreement in the Cipla emtricitabine suit included an agreement that Gilead would not sue for infringement of those patents, and instead, Cipla would be allowed to market Atripla on terms agreed to by Gilead and Cipla. The patents covering the combinations of TDF, emtricitabine, and efavirenz in Atripla were not at issue in the Cipla emtricitabine suit, so any agreement to allow Cipla to market a generic version of Atripla, or escape an infringement suit relating to those patents, represents compensation that Cipla could not have obtained in its emtricitabine suit even if it had prevailed.

d.   Gilead's letters requesting dismissal of the case refer to a "Settlement and License Agreement," indicating that Cipla will be allowed to compete on terms dictated by agreement between Gilead and Cipla.

e.   In September 2014, less than two months after the Cipla emtricitabine suit was settled, Gilead announced that it was licensing seven Indian generics manufacturers, including Cipla, to sell generic versions of Gilead's hepatitis C drugs sofosbuvir and ledipasvir in 91 developing countries, including India. At the time, a news article reported, "Estimates suggest that ledipasvir could potentially be worth US$300–US$500m, and offer a $110–$185m formulation and active pharmaceutical ingredient (API) opportunity. Cipla is expected to earn API rights to the drug, though this could not be immediately confirmed." Manufacturing Chemist, Gilead announces generic licensing agreements with Indian companies (Sept. 16, 2014), available at https://bit.ly/2lTQvqO. It is plausible that the sudden availability

of a benefit worth as much as $185 million to Cipla was related to the settlement of the Cipla emtricitabine suit less than two months earlier.

**C.  Gilead Settles Several Other Suits Relating to Its Patents on Its HIV Drugs.**

57.    In addition to settling with Teva and Cipla, Gilead has established a pattern of bringing and then quickly settling patent infringement suits whenever a generic drug manufacturer files a Paragraph IV certification with respect to patents covering its HIV medications.

58.    Aurobindo Pharma Limited or Aurobindo Pharma USA, Inc. (collectively "Aurobindo") submitted ANDAs in which it sought to market generic versions of Emtriva (submitted in 2007), Truvada (2008), and Atripla (2011). Initially, all three ANDAs contained Paragraph III certifications, indicating that Aurobindo would wait until the expiration of the patents on those drugs before marketing generic versions. The ANDAs for Emtriva, Truvada, and Atripla were tentatively approved in May 2008, March 2009, and April 2013, respectively.

59.    In May 2016, Aurobindo informed Gilead that it had amended its ANDA for Emtriva to include a Paragraph IV certification for the '245 and '396 Patents, the same patents on emtricitabine at issue in the Teva and Cipla emtricitabine suits. On June 23, 2016, Gilead sued Aurobindo for infringing those patents. *Gilead Sciences, Inc.  v. Aurobindo Pharma Ltd.*, No. 1:16-cv-3722 (D.N.J.). The case settled quickly and was dismissed on September 16, 2016. No terms of the settlement were disclosed to the public, although the dismissal did state that each party would bear its own costs, expenses, and attorneys' fees.

60.    In May 2016, Aurobindo also informed Gilead that it had amended its ANDA for Truvada to include a Paragraph IV certification for the '245 and '396 Patents on emtricitabine, as well as two other patents that cover the combination of TDF and emtricitabine in a single dosage form: Patent Nos. 8,592,397 and

8,716,264. On July 8, 2016, Gilead sued Aurobindo for infringing those patents. The case, *Gilead Sciences, Inc.  v. Aurobindo Pharma Ltd.*, No. 1:16-cv-4178 (D.N.J.), was filed in the same court and assigned to the same judge as Aurobindo's emtricitabine suit. Like that case, this one settled quickly and was dismissed on September 16, 2016. No terms of the settlement were disclosed to the public, although the dismissal did state that each party would bear its own costs, expenses, and attorneys' fees.

61.    In April 2018, Aurobindo informed Gilead that it had submitted an ANDA to market generic versions of lower-dosage forms of Truvada, and that its ANDA had a Paragraph IV certification for the '245 and '396 Patents on emtricitabine. (Aurobindo did not have to make a Paragraph IV certification for the patents that cover the combination of TDF and emtricitabine in a single dosage form because those patents do not cover the lower-dosage forms.) On May 18, 2018, Gilead sued Aurobindo for infringing the '245 and '396 Patents. *Gilead Sciences, Inc.  v. Aurobindo Pharma Ltd.*, No. 1:18-cv-765 (D. Del.). On October 3, 2018, the parties stipulated to a stay of the case "pending final documentation of a settlement agreement." The stay was granted the next day. On October 5, 2018, the parties stipulated to an order dismissing the case. No terms of the settlement were disclosed to the public, although the dismissal did state that each party would bear its own costs, expenses, and attorneys' fees. The court entered the dismissal order on October 10, 2018.

62.    On July 13, 2012, Lupin Ltd. informed Gilead that it had submitted an ANDA in which it sought to market a generic version of Truvada. The ANDA contained a Paragraph IV certification with respect to Gilead's patents on emtricitabine and TDF. On August 16, 2012, Gilead filed two separate suits against Lupin, one claiming infringement of the patents on emtricitabine, and the other claiming infringement of the patents on TDF. *Gilead Sciences, Inc. v. Lupin Ltd.*, No. 1:12-cv-6293 (S.D.N.Y.) (the "first Lupin emtricitabine suit"); *Gilead Sciences,*

*Inc. v. Lupin Ltd.*, No. 1:12-cv-6294 (S.D.N.Y.) (the "Lupin TDF suit"). Both cases were filed in the same court and assigned to the same judge as the Teva emtricitabine and TDF suits, and the Cipla emtricitabine and TDF suits. At least some of the discovery in the Lupin suits was coordinated with discovery in the Cipla suits.

63. The Lupin TDF suit proceeded through discovery and was dismissed on May 30, 2014. The dismissal order is almost entirely redacted, but it does provide that each party shall bear its own costs, disbursements, and attorneys' fees. Gilead stated in its 2015 Form 10-K: "In May 2014, Lupin amended its ANDAs to certify that it is no longer seeking approval to market generic versions of Truvada and Viread prior to the expiration of the four patents associated with tenofovir disoproxil fumarate in January 2018 (including pediatric exclusivity)."

64. On June 13, 2014, Lupin Ltd. informed Gilead that it had submitted an ANDA in which it sought to market a generic version of Atripla. The ANDA contained a Paragraph IV certification with respect to the '245 and '396 Patents on emtricitabine. On July 16, 2014, Gilead sued Lupin for infringing these patents. *Gilead Sciences, Inc. v. Lupin Ltd.*, No. 1:14-cv-5352 (S.D.N.Y.) (the "second Lupin emtricitabine suit"). The case was filed in the same court and assigned to the same judge as the first Lupin emtricitabine suit.

65. The parties to the first Lupin emtricitabine suit had completed all or nearly all discovery by July 18, 2014, when the Court scheduled a trial beginning on December 8, 2014. On August 6, 2014, the Court consolidated the first and second Lupin emtricitabine suits for trial, based on the parties' agreement that doing so would not require a change in schedule. On September 16, 2014, the parties advised the Court that they had executed a settlement, and the two Lupin emtricitabine suits were dismissed the next day. In their letter to the Court about the settlement, Gilead's counsel stated, "The parties respectfully request that the Court enter the Order on Stipulation for Dismissal attached as Exhibit A to this letter pursuant to the Settlement and License Agreement." No terms of the settlement, or any license

agreement, were disclosed to the public, although the dismissal did state that each party would bear its own costs, expenses, and attorneys' fees.

66.     On April 24, 2014, Mylan Inc. informed Gilead that it had submitted an ANDA in which it sought to market a generic version of Truvada. The ANDA contained a Paragraph IV certification with respect to Gilead's patents on emtricitabine, as well as a patent covering the combination of TDF and emtricitabine in a single dosage form: Patent No. 8,592,397. Gilead filed suit against Mylan in the Southern District of New York on June 2, 2014. When Mylan indicated that it would contest personal jurisdiction there, Gilead filed suit in the Northern District of West Virginia. *Gilead Sciences, Inc. v. Mylan Inc.*, No. 1:14-cv-99 (N.D. W. Va.). Gilead then dismissed the suit in New York.

67.     The case proceeded through discovery, and Gilead amended its complaint twice, adding a claim of infringement of another patent covering the combination of TDF and emtricitabine in a single dosage form: Patent No. 8,716,264.

68.     Gilead was on the losing end of a discovery dispute that echoed one of its losses in the Teva emtricitabine suit: one in which it prejudiced itself by not preparing a response to an opponent's defense, claimed that the defense was new and unanticipated, and then was told by the Court that it should have seen the defense coming. This time, the context was a request for the production of documents from Mylan that Gilead claimed were relevant to Mylan's "enablement" defense, which claimed that the patents on Truvada did not enable a "person skilled in the art" to make Truvada. The problem for Gilead was that Mylan had refused to produce those documents, and Gilead had missed the deadline to move to compel by months. Gilead's excuse was that it was not on notice of the enablement defense until after Mylan's refusal, but the Court pointed out filings where Mylan had explicitly invoked the defense, and stated that "Gilead's argument … strains credulity." Thus, Gilead's motion to compel was denied as untimely.

69.     The denial of Gilead's motion to compel was the last substantive development in the case. Less than six weeks later, the case settled. No terms of the settlement were disclosed to the public, although the dismissal did state that each party would bear its own costs, expenses, and attorneys' fees.

70.     Hetero Drugs Ltd., Hetero Labs Ltd., or Hetero USA Inc. (collectively "Hetero") submitted an ANDA in which it sought to market a generic version of Truvada. The FDA tentatively approved the ANDA on December 22, 2011. The ANDA and the approval letter are not publicly available, but Hetero presumably made a Paragraph III certification regarding the patents listed in the Orange Book for Truvada, including the emtricitabine patents.

71.     On June 29, 2016, Hetero informed Gilead that it had amended its ANDA to include a Paragraph IV certification for the '245 and '396 Patents on emtricitabine, as well as two other patents that cover the combination of TDF and emtricitabine in a single dosage form: Patent Nos. 8,592,397 and 8,716,264. On August 11, 2016, Gilead sued Hetero for infringing those patents. The case, *Gilead Sciences, Inc. v. Hetero Drugs Ltd.*, No. 16-cv-4938 (D.N.J.), was filed in the same court and assigned to the same judge as the Aurobindo suits.

72.     The case was not litigated, and the parties stipulated to dismissal, which was granted on August 26, 2016. No terms of the settlement were disclosed to the public, although the dismissal did state that each party would bear its own costs, expenses, and attorneys' fees.

73.     In or around December 2016, Amneal Pharmaceuticals, LLC submitted an ANDA in which it sought to market a generic version of Truvada. The ANDA contained Paragraph IV certifications for at least three of the patents listed in the Orange Book for Truvada: the '245 and '396 Patents on emtricitabine, as well as one other patent that covers the combination of TDF and emtricitabine in a single dosage form: Patent No. 8,716,264. On April 6, 2017, Gilead sued Amneal for infringing those patents. *Gilead Sciences, Inc. v. Amneal Pharmaceuticals, LLC*, No. 17-cv-

2335 (D.N.J.).

74.     The case was not litigated, and it was dismissed without prejudice under Rule 41(a)(1)(A)(i) on April 18, 2017.

75.     On May 31, 2017, Amneal informed Gilead that it had submitted an ANDA to market generic versions of lower-dosage forms of Truvada, and that its ANDA had a Paragraph IV certification for the '245 and '396 Patents on emtricitabine. (Amneal did not have to make a Paragraph IV certification for the patents that cover the combination of TDF and emtricitabine in a single dosage form because those patents do not cover the lower-dosage forms.) On July 13, 2017, Gilead sued Amneal for infringing the '245 and '396 Patents. *Gilead Sciences, Inc. v. Amneal Pharmaceuticals LLC*, No. 1:17-cv-943 (D. Del.).

76.     The parties began discovery and agreed on claim construction. On June 7, 2018, they stipulated to dismissal, which was entered the next day. No terms of the settlement were disclosed to the public, although the dismissal did state that each party would bear its own costs, expenses, and attorneys' fees.

77.     On March 31, 2012, Macleods Pharmaceuticals Ltd. submitted an ANDA in which it sought to market a generic version of Atripla. Initially, this ANDA contained Paragraph III certifications, indicating that Macleods would wait until the expiration of the patents on Atripla before marketing a generic version. The ANDA was tentatively approved on November 28, 2014.

78.     On June 13, 2017, Macleods informed Gilead that it had submitted ANDAs to market generic versions of Truvada and Atripla. Both ANDAs contained Paragraph IV certifications. On July 27, 2017, Gilead sued Macleods for infringing the '245 and '396 Patents on emtricitabine, as well as three other patents that cover the combination of TDF and emtricitabine in a single dosage form: Patent Nos. 8,592,397, 8,716,264, and 9,457,036. *Gilead Sciences, Inc.   v. Macleods Pharmaceuticals, Ltd.*, No. 1:17-cv-1039 (D. Del.).

79.     The parties agreed to several extensions of Macleods' time to answer

the complaint. Ultimately, no answer was filed, the case settled, and it was dismissed without prejudice under Rule 41(a)(1)(A)(i) on December 20, 2017. No terms of the settlement were disclosed to the public, although the dismissal did state that no fees or costs shall be awarded to any party.

80.     On December 30, 2008, Strides Pharma, Inc. submitted an ANDA in which it sought to market a generic version of Truvada. Initially, this ANDA contained Paragraph III certifications, indicating that Strides would wait until the expiration of the patents on Truvada before marketing a generic version. The ANDA was tentatively approved on July 31, 2013.

81.     On May 15, 2018, Strides informed Gilead that it had amended its ANDA to include a Paragraph IV certification for the '245 and '396 Patents on emtricitabine, as well as four other patents that cover the combination of TDF and emtricitabine in a single dosage form: Patent Nos. 8,592,397, 8,716,264, 9,457,036, and 9,744,181. On June 27, 2018, Gilead sued Strides for infringing those patents. *Gilead Sciences, Inc. v. Strides Pharma, Inc.*, No. 18-cv-11134 (D.N.J.).

82.     Strides answered Gilead's complaint on July 18, 2018. On September 6, 2018, the parties asked for an adjournment of the Rule 16 conference so they could discuss settlement. The request was granted the next day. On December 21, 2018, the parties asked the court to enter an order dismissing the case with prejudice. No terms of the settlement were disclosed to the public, although the stipulated dismissal order did state that each party shall bear its own costs, expenses, and attorneys' fees. The court entered the order on January 9, 2019.

83.     On December 3, 2018, Zydus Pharmaceuticals (USA) Inc. and Calida Healthcare Ltd. (which does business as Zydus Calida) (together, "Zydus") informed Gilead that they had submitted an ANDA for various fixed-dose combinations of emtricitabine and TDF. The ANDA includes a Paragraph IV certification for the '245 and '396 Patents on emtricitabine, as well as four other patents that cover the combination of TDF and emtricitabine in a single dosage form: Patent Nos.

8,592,397, 8,716,264, 9,457,036, and 9,744,181. On January 15, 2019, Gilead sued Zydus for infringing those patents. *Gilead Sciences, Inc. v. Zydus Pharmaceuticals (USA) Inc.*, No. 19-cv-529 (D.N.J.). Zydus filed its answer on June 14, 2019, and the parties stipulated to dismissal on August 13, 2019.

### V. Additional Factors Imply That Gilead Resolved Its Litigation with Cipla with a Large, Unexplained Reverse Payments.

84.     In addition to the specific circumstances of the litigations described above, the broader pattern of litigation and the market for Truvada and Atripla implies that Gilead made large, anticompetitive, unexplained reverse payments to settle its cases.

### A. The Pattern of Litigation Points to the Weakness of Gilead's Patents and Gilead's Willingness to Compensate Generic Manufacturers for Not Competing.

85.     The sheer number of companies that submitted Paragraph IV certifications for Emtriva, Truvada, and Atripla, combined with Gilead's settlement of every infringement litigation, implies that Gilead and the generic manufacturers it sued all saw Gilead's patents as weak.

86.     Moreover, Gilead and the defendants have kept all terms of their settlement agreements confidential, except for the year that Truvada will face generic competition. Doing so insulates the agreements from public scrutiny.

### B. Gilead Had Every Incentive to Delay Serious Competition for Truvada Until 2021, Which Is What It Did.

87.     Even if the fixed-dose combination patents for Truvada are valid, Gilead could still face competition from copackaged drugs beginning in 2021, as explained below. If the patents on emtricitabine were held to be invalid, however, Truvada and Atripla would face significant competition in 2018 instead, three years earlier. This is because the patents on the components of Truvada other than emtricitabine expire that year. Because Gilead expected to sell several billion dollars' worth of Truvada between 2018 and 2021, it had every incentive to prevent a court from holding the emtricitabine patents invalid.

88.     A fixed-dose combination is two or more drugs contained in a single dosage form, such as a capsule or tablet. A copackaged drug is one in which multiple capsules, tablets, or some other dosage form containing different drugs are packaged together. Truvada and Atripla are fixed-dose combinations. To obtain FDA approval without having to undertake the extensive testing associated with a New Drug Application, a manufacturer of a fixed-dose combination must demonstrate that the fixed-dose combination is bioequivalent to the individual drugs taken separately. The FDA has defined bioequivalence as: "The absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study." 21 C.F.R. § 320.1. Gilead obtained approval for Truvada this way. In fact, Truvada's FDA-approved label states, "One TRUVADA tablet was bioequivalent to one EMTRIVA capsule (200 mg) plus one VIREAD tablet (300 mg) following single-dose administration to fasting healthy subjects (N=39)."

89.     In 2006, the FDA published a document called, "Guidance for Industry: Fixed Dose Combinations, Co-Packaged Drug Products, and Single-Entity Versions of Previously Approved Antiretrovirals for the Treatment of HIV." The FDA explained that "[t]his guidance is intended to encourage sponsors to submit applications to the Food and Drug Administration (FDA) for approval of fixed dose combination (FDC) and copackaged versions of previously approved antiretroviral therapies for the treatment of human immunodeficiency virus (HIV)." Fixed-dose combinations and co-packaged drugs, the FDA noted, both "may facilitate distribution and improve patient adherence." The guidance also stated that the "FDA believes that when adequate evidence of safety and efficacy exists for the use of combination therapy with individually approved HIV drugs, the path to regulatory approval of an FDC or co-packaged configuration of those drugs is straightforward.

FDA is prepared to move swiftly to evaluate such products when applications are submitted for approval." Such products are eligible for priority review, which takes six months or less. The FDA pointed out that even if the individual drugs that make up the fixed-dose combination or copackaged configuration are covered by a patent, the FDA can still grant tentative approval so that the fixed-dose combination or copackaged configuration could be marketed as soon as the patents expire. The guidance also listed several drug combinations for which an application for a copackaged configuration would not require clinical studies. The drug combinations of Truvada and Atripla were on the list.

90.    Given the FDA's guidance, the only real obstacle to the approval of copackaged equivalents of Truvada was the patent protection on the individual components of those drugs. The relevant components of Truvada are TDF and emtricitabine. The relevant components of Atripla are TDF, emtricitabine, and efavirenz. The last patent on TDF expired on January 25, 2018, although Gilead had given Teva had the right to market generic TDF beginning on December 15, 2017. The last patent on emtricitabine is scheduled to expire on March 9, 2021. Emtricitabine is also subject to a pediatric exclusivity period of six months beyond its statutory expiration date, which means that the FDA will not grant final approval for generic emtricitabine before September 9, 2021.

91.    If the '245 and '396 Patents on emtricitabine are valid, then no copackaged equivalent of Truvada can be approved before September 9, 2021. But if those patents are invalid, then copackaged equivalents of Truvada could have been approved much sooner. The only other patent on emtricitabine relevant to this litigation is Patent Number 5,914,331, whose protection ended on January 2, 2018 (including a period of pediatric exclusivity). Thus, Teva could have obtained approval for a copackaged equivalent of Truvada on January 2, 2018, and other manufacturers, including Cipla, could have done so on January 25, 2018.

92.    The FDA's 2006 guidance strongly implies that it would have approved

copackaged equivalents of Truvada for the same indications for which Truvada is approved. The approval of copackaged equivalents of Truvada would have quickly led to their availability at substantially lower prices. For example, just before Gilead's last patent on Viread expired, the National Average Drug Acquisition Cost (NADAC) for one Viread tablet was $36.75. Less than a year later, the price of the generic version of Viread hit a low of $1.28, a decrease of 96.5%. With approval of a copackaged equivalent of Truvada, and in the absence of patent protection on emtricitabine, a generic version of Emtriva would have been priced at a similar discount to Emtriva, whose NADAC is currently $17.18 per tablet. If that discount were also 96.5%, then a tablet of generic emtricitabine would cost $0.60. A month's supply of the copackaged equivalent of Truvada would cost $56.40, instead of the $2,000 that Gilead charges for brand-name Truvada.

93. FDA approval of copackaged versions of Truvada would have decimated Gilead's profits, while benefitting consumers greatly. Something similar happened to Gilead's drug Harvoni, which is used to treat hepatitis C. Harvoni is very effective in treating hepatitis C, but it was extremely expensive when it was introduced, with a list price of $84,000 for a course of treatment. Harvoni was a huge financial success for Gilead, earning more than $13 billion in revenue its first full year on the market. But when the drug manufacturer AbbVie obtained approval for a competitor drug, Viekira Pak, the net price of Harvoni (that is, the list price minus Gilead's rebates) collapsed. Viekira Pak was a copackaged drug, with patients having to take multiple pills per day. But just three days after the approval of Viekira Pak, Express Scripts, the nation's largest pharmacy benefit manager (PBM), announced that it would make Viekira Pak its preferred treatment for hepatitis C genotype 1 (the most common genotype in the United States), and it would no longer cover Harvoni. The deal resulted in AbbVie's offer to sell Viekira Pak to Express Scripts for a net price of approximately $51,000 to $66,000, a significant discount to the $84,000 that Gilead was charging for Harvoni. Shortly after, Gilead entered

into discounting agreements for Harvoni with CVS, Anthem, Humana, Aetna, Cigna and UnitedHealth Group. According to a report by the United States Senate Committee on Finance, industry sources estimated that those discounts were approximately 40% from the list price.

94.     There are many reasons to believe that Truvada would have been discounted at least as severely if it had faced competition from a copackaged version. First, the individual components of Truvada, TDF and emtricitabine, are inexpensive to manufacture, as described above. Second, unlike Viekira Pak, a copackaged version of Truvada would have the exact same active ingredients as Truvada itself, making it even easier for pharmacy benefit managers and payors to justify taking Truvada off their formularies (or demoting it) in favor of the copackaged version. Third, if a copackaged version of Truvada were to become available as a result of the invalidation of Gilead's patents on emtricitabine, several generic drug manufacturers would have been able to sell the copackaged version beginning in early 2018. By contrast, when Viekira Pak was introduced, AbbVie was the only manufacturer with the right to make it. More intense competition for a copackaged version of Truvada would have lowered the price even further.

95.     The way Gilead chose to respond to these various threats of competition was to offer valuable consideration to Cipla in exchange for its agreement not to challenge the patents on emtricitabine, as described above. The result of these agreements was that Cipla declined to enter the market "at risk," dropped its challenge to the emtricitabine patents, and agreed not to compete against Truvada until some date in the future. But for the large and unjustified reverse payment that Gilead made, Cipla would have competed against Truvada during the class period by selling the components of Truvada as a copackaged version on or shortly after January 2, 2018.

## VI.     Relevant Markets

96.     The relevant product market (the "Truvada market") in this case

includes Truvada, the generic equivalent of Truvada, and the copackaged equivalent of Truvada. These drugs are not interchangeable with other drugs outside the Truvada market. A hypothetical monopolist could profitably impose a small but significant and non-transitory increase in price above competitive levels for the drugs in the Truvada market. Within that market, the potential competitors are the generic formulation of Truvada, and a co-packaged formulation of Truvada.

97.    The relevant geographic market for the Truvada market is the United States. For purposes of this complaint, "United States" includes its territories and the District of Columbia. Gilead sells Truvada across the United States, and it is unlawful for customers to import foreign versions of Truvada, or its generic or copackaged equivalents.

98.    Gilead has market power the relevant markets. Because of its patents on emtricitabine, and other manufacturers' agreements not to challenge those patents or manufacture emtricitabine themselves, Gilead is the only company authorized to manufacture Truvada, generic Truvada, or copackaged Truvada in the United States.

## VII.  Interstate Commerce

99.    Gilead's actions with respect to its drugs containing emtricitabine have restrained interstate trade. Gilead markets and sells these drugs throughout the United States. Likewise, competitive products would be sold throughout the United States.

## VIII.  Antitrust Impact and Damages

100.    But for Gilead's unlawful agreements, the price of Truvada would have been significantly lower, and lower-priced copackaged equivalents would have been available.

101.    In that circumstance, the Plaintiff and Class members would have paid less for prescription medications in one or more of the following ways:

      a.    Paying less for Truvada.

      b.    Substituting purchases of lower-priced generic or co-packaged

equivalents of Truvada.

c.  Moving Truvada into a higher tier on their formularies, or removing it entirely, in order to pay less of the cost of those medications.

102.  To a large extent, the Plaintiff's and Class members' savings would have been accomplished through the insurers and PBMs that manage their prescription drug benefits. As described above, when a copackaged version of Gilead's drug Harvoni became available, the nation's largest insurers and PBMs either dropped Harvoni from their formularies in favor of its competitor, or significantly reduced the cost of Harvoni to their clients.

103.  While an exact calculation is not yet available, damages suffered by the Plaintiff and Class members is at least in the hundreds of millions of dollars. Gilead's United States revenue from Truvada from the beginning of 2018 to June 30, 2020 was approximately $6 billion, and a significant portion of that amount represents overpayments by Plaintiff and Class members.

104.  Therefore, Gilead's unlawful agreements are a proximate cause of the antitrust injury to the Plaintiff and Class members.

## IX.  Class Action Allegations

105.  Pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), the Plaintiff brings this action on behalf of itself and the following class (the "Class"):

> All self-insured or mixed-insured group health plans in the United States that paid for Truvada on behalf of their members from January 25, 2018 to the present.

106.  Excluded from the Class are employee welfare benefit plans sponsored by Gilead, Cipla, or their affiliates, and governmental entities, except for government-funded employee benefit plans.

107.  The Plaintiff also reserves the right to request class certification with respect to particular issues under Federal Rule of Civil Procedure 23(c)(4).

108.   The Class is so numerous that joinder of all members is impracticable. According to the Department of Labor, in 2016 there were about 23,700 self-insured group health plans in the United States, and about 4,100 group health plans that mixed self-insurance with insurance ("mixed-insured").

109.   There are questions of law or fact common to the class. These questions include:

a.   The terms of Gilead's Settlement and License Agreement with Cipla.

b.   Whether Gilead and Cipla made an agreement whose effect was to forestall competition for Truvada in exchange for a large unjustified payment from Gilead to Cipla.

c.   Whether any such agreement violated the state and federal laws listed below.

d.   The effect of any such agreement on the net price of Truvada.

e.   The definition of relevant product and geographic markets.

f.   Whether Gilead's conduct substantially affected interstate commerce.

g.   The total amount of damage suffered by the Class.

h.   The Class's entitlement to injunctive relief.

110.   These common questions of law and fact predominate over any issues affecting only individual Class members.

111.   The claims or defenses of the Plaintiff are typical of the claims or defenses of the Class. The Plaintiff and members of the Class were harmed by the identical conduct, and the theory of harm is the same—the price of Truvada was artificially kept high through an agreement between Gilead and Cipla.

112.   The Plaintiff will fairly and adequately protect the interests of the Class. The Plaintiff is represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation, including such litigation in the

healthcare industry. The Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

113.   The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Gilead.

114.   Gilead has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. All Class members are affected by Gilead's agreements that forestall competition for Truvada.

115.   A class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The Class members have no particular interest in individually controlling the prosecution of separate actions, as their individual damages might not justify doing so, and the Plaintiff's claims are typical of Class members' claims. There is no existing litigation brought by individual Class members arising from the anticompetitive conduct described in this complaint. Concentrating the litigation in this forum is desirable because Gilead is located here, and litigating in multiple forums would be unmanageable. This class action would not pose any particular difficulty; classes have often been certified in "pay-for-delay" cases like this one.

## X.    Claims for Relief

### COUNT I
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

116.   The Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

117.   As set forth above, Gilead entered into an agreement in restraint of trade, namely its agreement with Cipla that forestalled competition for Truvada. This agreement constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

118.   Gilead's unlawful conduct threatens to continue to injure the Plaintiff.

But for the agreement, Cipla (and potentially other manufacturers) could obtain FDA approval for a co-packaged equivalent of Truvada relatively easily, and offer such a product in the United States, giving the Plaintiff a lower-cost alternative to Truvada and reducing the price of Truvada itself. Introducing such a product would be in Cipla's interest, as Cipla could earn significant profits while still setting a price well below the current price of Truvada.

119.   Therefore, the Plaintiff and the Class are entitled to an injunction against Gilead's agreement with Cipla pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT II
## VIOLATION OF THE CARTWRIGHT ACT,
## CAL. BUS. & PROF. CODE §§ 16700 *et seq.*

120.   The Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

121.   The Defendants have restricted trade or commerce, limited or reduced production, and prevented competition in the markets described above.

122.   The Defendants' actions thus violate the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, including but not limited to Cal. Bus. & Prof. Code § 16720.

123.   This claim is brought on behalf of all Class members nationwide for the reasons articulated in *In re Qualcomm Antitrust Litigation*, 328 F.R.D. 280 (N.D. Cal. 2018).

124.   Therefore, the Plaintiff and the Class are entitled to damages, interest, injunctive relief, and reasonable attorneys' fees and costs, pursuant to Cal. Bus. & Prof. Code § 16750.

## COUNT III
## VIOLATION OF UNFAIR COMPETITION LAW,
## CAL. BUS. & PROF. CODE §§ 17200 *et seq.* ("UCL")

125.   The Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein, except any allegations as to entitlement to

damages.

126.   The Defendants have engaged and continue to engage in acts and practices of unfair competition, as that term is defined in Business & Professions Code § 17200, by engaging in conduct that has substantial nexus to the State of California as set forth above. As used in this Complaint "unfair competition" means an unlawful, unfair or fraudulent business act or practice.  This conduct is actionable pursuant to Business & Professions Code §§ 17200 and 17203.

127.   The Defendants' violations of the Sherman Act and Cartwright Act also constitute "unlawful" business acts or practices within the meaning of the UCL.

128.   The Defendants' policies and practices as detailed herein causes substantial injury to non-competitors with no countervailing legitimate benefit and/or is immoral, unethical, oppressive, unscrupulous, and/or unconscionable, and thereby constitutes "unfair" business acts or practices within the meaning of the UCL.

129.   The Defendants' policies and practices as detailed herein and the making of material statements and/or material omissions of fact relating thereto as set forth in detail above, all of which is likely to mislead the Plaintiff, Class members and the public, constitutes "fraudulent" business acts or practices within the meaning of the UCL.

130.   In engaging in conduct that constitutes unfair competition, each Defendant has acquired or retained money or property to which Plaintiff and Class members have a superior vested interest.

131.   The Plaintiff has suffered injury in fact and a loss of money or property as a result of the Defendants' acts of unfair competition in that they have paid more for these medications than they would have paid absent Defendants' anti-competitive conduct and have standing to bring this claim pursuant to Cal Bus. & Prof. Code §§ 17203 and 17204.

132.   Pursuant to Business & Professions Code §§ 17203 and 17204, the

Court may enjoin such conduct on behalf of the Class and for the benefit of the general public, and order the Defendants to restore to the Plaintiff and Class members any money or property that the Defendants may have acquired or retained, directly or indirectly, as a result of any act or practice that constitutes unfair competition.  The Court may also order the Defendants to disgorge as part of its restitutionary powers any profits the Defendants may have obtained either directly or indirectly from Plaintiff and Class members as a result of this conduct.

133.   Plaintiff also seeks the payment of fees and costs pursuant to, *inter alia*, Cal. Code Civ. Proc. § 1021.5.

**COUNT IV**
**RESTITUTION, MONEY HAD AND RECEIVED, UNJUST**
**ENRICHMENT, QUASI-CONTRACT AND/OR ASSUMPSIT**
**(AGAINST DEFENDANT GILEAD)**

134.   The Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

135.   This Cause of Action is not derivative of the other Causes of Action asserted above, but rather is recognized as a separate and independent alternative Cause of Action that may be submitted to the jury.

136.   Based on the allegations set forth above, Plaintiff and Class members may properly assert an independent Cause of Action for equitable restitution and/or restitutionary damages at law derived from the principles of restitution and unjust enrichment, based on common counts such as monies had and received and mistaken receipt or retention of monies, and/or by implying an obligation at law based on principles of quasi-contract or the common-law principle of assumpsit. Under principles recognized under such common law theories of recovery, and under the circumstances alleged herein, it would be inequitable or unjust, as between the parties, for Gilead to retain such benefits based on the conduct described above.

137.   By either paying monies for the products at issue that Gilead charged supracompetitive prices for, Plaintiff and Class members conferred a benefit on Gilead. Gilead owes Plaintiffs and Class members specific sums that can be

measured and calculated based on the records of or that are available to Gilead.

138.   Specifically, Plaintiffs seek, both for themselves and all others similarly situated, restitution at both equity and law measured as the inflated price of the medications at issue due to the illegal conduct of Gilead, either in terms of moneys expended for such medications plus any moneys or profits retained or made by Gilead on such amounts.

139.   Such money or property belongs in good conscience to Plaintiff and Class members. Gilead was unjustly conferred a benefit by Plaintiff and Class members through illegal conduct or acts of mistake or fraud as set forth above. Having received such benefits using misleading and illegal acts, practices and/or policies and omitting material facts as set forth in detail above, Gilead is therefore required to pay monies to Plaintiffs and Class members under common law principles of restitution.

140.   One who acquires a benefit may not justly retain such monies and thus must return such monies so as not to be unjustly enriched. Gilead has been unjustly enriched by Class members through payments or retention of monies it was able to retain or not pay, and the resulting profits enjoyed by Gilead. Gilead's unjust enrichment is related to and flowed from the conduct challenged in this Complaint. Such monies were not intended to be used for Plaintiff and Class members' benefit, but rather for Gilead's own profit. Gilead is therefore required to pay such monies to Plaintiff and Class members under common law principles of unjust enrichment.

141.   An entity that has been unjustly enriched at the expense of another by the retention of a benefit wrongfully obtained or retained at another's expense is required to make restitution to the other. Gilead is required to pay over such benefits when the retention of such benefits would unjustly enrich Gilead under common law principles of common counts such as money had and received and mistaken receipt or retention of monies.

142.   Gilead entered into a series of implied-at-law obligations that resulted

in a sum certain as stated above being unjustly retained by Gilead, either directly or indirectly, at the expense of Plaintiff and Class members. Gilead had knowledge of such benefits. This obligation is imposed by law, regardless of the intent of the parties. Equity and good conscience dictate that under the circumstances Gilead as the benefitted party should make restitution to Plaintiffs and Class members of such monies under common law principles of quasi-contract.

143. Plaintiff and Class members plead just grounds for recovering money for benefits Gilead either directly or indirectly either received or failed to pay under the above principles of common law. Gilead must restore or pay over to Plaintiff and Class members money or benefits that Gilead received or retained, but that really should belong to Plaintiff and Class members, as Gilead either knew or had reason to know that it was charging supracompetitive prices for these medications. Under these circumstances such monies were not properly paid to or retained by Gilead. Gilead has an obligation created by law to ensure the status quo is obtained or retained and to restore Plaintiff and Class members to their former or rightful position by paying over monies Gilead is not lawfully entitled to retain. As Gilead is unjustly retaining such benefits at the expense of Plaintiff and Class members, the unjustified retention of such monies entitles Plaintiff and Class members to restitution of such monies under common law principles of assumpsit.

144. Pursuant to California Civil Code § 2224, one who gains or retains a thing (including money) by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, unless they have some other and better right thereto, is an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it. Based on the facts and circumstances alleged above, in order to prevent unjust enrichment and to prevent Gilead from taking advantage of its own wrongdoing, Plaintiff and Class members are entitled to the establishment of a constructive trust, in a sum certain, of all monies that have been improperly retained by Gilead, as well as the monies made by Gilead on such monies, from which

Plaintiff and Class members may seek restitution.

145.   In addition, in light of Gilead's knowledge of the true facts as set forth above, Gilead's conduct warrants an assessment of exemplary damages under this independent cause of action in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

146.   Other causes of action may not permit Plaintiff and Class members to obtain the relief available under this Cause of Action, otherwise leaving them without a complete and adequate remedy at law in terms of the relief sought herein.

147.   Based on the facts set forth above, Plaintiff, both individually and on behalf of the Class, seeks appropriate restitution and/or restitutionary damages and exemplary damages as is permitted by law for such claims. Plaintiff, both individually and on behalf of the Class, also requests an order for an accounting of all such monies to which they are entitled.

**COUNT V**
**VIOLATION OF STATE LAW**

148.   The Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

149.   To the extent the Cartwright Act is found to not apply to the claims of Class members not located outside the State of California, by virtue of their anticompetitive actions described above, the Defendants have violated the state laws listed below, injuring the Plaintiff and Class members located in those states:

        a.    Ariz. Rev. Stat. § 44-1401 et seq.

        b.    Conn. Gen. Stat. § 35-24 et seq.

        c.    D.C. Code § 28-4501 et seq.

        d.    Fla. Stat. § 501.201 et seq.

        e.    Haw. Rev. Stat. § 480-1 et seq.

        f.    Iowa Code § 553.1 et seq.

        g.    Kan. Stat. Ann. § 50-101 et seq.

h.   Md. Code Ann., Com. Law § 11-201 et seq.

i.   Me. Rev. Stat. tit. 10, § 1101 et seq.

j.   Mass. Gen. L. Ch. 93A

k.   Mich. Comp. Laws § 445.771 et seq.

l.   Minn. Stat. § 325D.49 et seq.

m.   Miss. Code Ann. § 75-21-1 et seq.

n.   Neb. Rev. Stat. § 59-801 et seq.

o.   Nev. Rev. Stat § 598A.010 et seq.

p.   N.H. Rev. Stat. Ann. § 356:1 et seq.

q.   N.M. Stat. Ann. § 57-1-1 et seq.

r.   N.Y. Gen. Bus. Law § 340 et seq.

s.   N.C. Gen. Stat. § 75-1 et seq.

t.   N.D. Cent. Code § 51-08.1-01 et seq.

u.   Or. Rev. Stat. § 646.705 et seq.

v.   L.P.R.A. tit. 10, § 260 et seq.

w.   R.I. Gen. Laws § 6-36-1 et seq.

x.   S.D. Codified Laws § 37-1-3.1 et seq.

y.   Tenn. Code Ann. § 47-25-101 et seq.

z.   Utah Code Ann. § 76-10-3101 et seq.

aa.   Vt. Stat. Ann. tit. 9, § 2453 et seq.

bb.   W. Va. Code § 47-18-1 et seq.

cc.   Wis. Stat. § 133.01 et seq.

150.   There are no material differences between the elements of proof under these state unfair competition laws and the Sherman and Cartwright Acts.

151.   Therefore, the Plaintiff and Class members who reside in one of these states are entitled to monetary and injunctive relief.

## XI.    Prayer for Relief

WHEREFORE, on behalf of themselves and the Class and to the extent appropriate for the benefit of the general public, the Plaintiff requests that the Court or jury as appropriate:

A.    Determine that this action may be maintained as a class action, and appoint the Plaintiff as representatives of the Class;

B.    Declare that the Defendants' conduct constitutes a violation of the Sherman Act, 15 U.S.C. § 1, and award treble damages to the Class under Sections 4 and 16 of the of the Clayton Act., 15 U.S.C. § § 15, 26;

C.    Declare that the Defendants' conduct constitutes a violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and award treble damages to the proposed Class under Cal. Bus. & Prof. Code § 16750;

D.    Declare that the Defendants' conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and appropriate injunctive and equitable monetary relief to the Class and for the benefit of the general public;

E.    To the extent found to be applicable, declare that the Defendants' conduct constitutes a violation of the state laws listed in Count V, and award the damages available under each state law to the members of the Class who reside in each state;

F.    Enjoin the Defendants from enforcing any agreement found to be anticompetitive, and from entering into any agreement that would restrict competition in the markets identified above;

G.    Award reasonable attorneys' fees and costs as allowed by law;

H.    Award pre-judgment and post-judgment interest as allowed by law;

I.    Award restitution and exemplary damages as allowed by law;

J.      Order an accounting of monies to which Plaintiff and the Class are entitled;

K.      Grant such other relief as the Court deems just and proper.

**XII.   Jury Demand**

The Plaintiff demands a trial by jury on all claims so triable.

DATED: September 17, 2020

Alan M. Mansfield (SBN 125998)
WHATLEY KALLAS LLP
amansfield@whatleykallas.com
1 Sansome Street, 35th Floor PMB #131
San Francisco, CA  94104
Tel: (619) 308-5034
Fax: (888) 341-5048

Joe R. Whatley, Jr.
(*Pro Hac Vice application to be filed*)
jwhatley@whatleykallas.com
Edith M. Kallas
(*Pro Hac Vice application to be filed*)
ekallas@whatleykallas.com
WHATLEY KALLAS, LLP
152 W. 57th Street, 41st Floor
New York, NY 10019
Tel: (212) 447-7060
Fax: (800) 922-4851

Henry C. Quillen
(*Pro Hac Vice application to be filed*)
hquillen@whatleykallas.com
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851

*Attorneys for Plaintiff*