Michael J. Shipley (SBN 233674)
KIRKLAND & ELLIS LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
Tel: (213) 680-8400
michael.shipley@kirkland.com

Jay P. Lefkowitz, P.C. (*pro hac vice*)
Devora W. Allon, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
lefkowitz@kirkland.com
devora.allon@kirkland.com

*Attorneys for Defendant Gilead Sciences, Inc.*

[Additional counsel appear on signature page]

Jason Haycock (SBN 278983)
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: 415-882-8200
Facsimile: 415-882-8220
Jason.Haycock@klgates.com

*Attorneys for Defendants Cipla Ltd. and Cipla USA Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| JACKSONVILLE POLICE OFFICERS AND FIRE FIGHTERS HEALTH INSURANCE TRUST, on behalf of itself and all others similarly situated;<br><br>Plaintiffs,<br><br>v.<br><br>GILEAD SCIENCES, INC., CIPLA LTD., and CIPLA USA INC.,<br><br>Defendants. | Case No. 4:20-CV-06522-JSW<br><br>**GILEAD AND CIPLA'S MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**<br><br>Hrg:      December 8, 2023<br>Time:    9:00 a.m.<br>Ctrm:    5 – 2nd Floor<br>Judge:   Honorable Jeffrey S. White |

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on Friday, December 8, 2023 at 9:00 a.m., or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, in Courtroom 5 on the 2nd Floor, before the Honorable Jeffrey S. White, Defendants Gilead Sciences, Inc. ("Gilead") and Cipla Ltd. and Cipla USA Inc. (collectively "Cipla," together with Gilead "Defendants") will move the Court for an order dismissing, with prejudice, all claims in this action against Defendants under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted, including all claims in the Third Amended Class Action Complaint, ECF 126-3. The Motion is based on this Notice of Motion and Motion to Dismiss, the Memorandum of Points and Authorities, Defendants' Request for Judicial Notice, all other pleadings and papers on file in this action, any other matters upon which the Court may take judicial notice, the arguments of counsel, and any other matter the Court may properly consider.

## RELIEF SOUGHT

Defendants seek dismissal under FRCP 12(b)(6), with prejudice, of all claims against them for failure to state a claim upon which relief can be granted.

## TABLE OF CONTENTS

**PAGE**

NOTICE OF MOTION AND MOTION TO DISMISS .......................................................................... i

RELIEF SOUGHT ............................................................................................................................ i

STATEMENT OF ISSUES TO BE DECIDED ................................................................................1

GLOSSARY ....................................................................................................................................1

BACKGROUND ..............................................................................................................................2

I.       Procedural History ..............................................................................................................2

II.      Amendments in Third Amended Complaint........................................................................2

LEGAL STANDARD.......................................................................................................................3

ARGUMENT....................................................................................................................................3

I.       Plaintiffs Still Fail to Allege Injury or Antitrust Standing.................................................3
         A.   Standing Requires that the Settlement Plausibly Caused the Alleged Injury. ...................4
         B.   These Allegations Have Already Been Considered and Rejected. .......................................5
         C.   Plaintiffs' Interpretation of the Emtricitabine Agreement is Not Plausible.........................5
         D.   Even if Accepted as True, the Allegations Are Insufficient. ...............................................7

II.      Plaintiffs Fail to Plausibly Allege a Large, Unexplained Reverse Payment...........................9
         A.   The Atripla License Was Not a Reverse Payment.................................................................9
         B.   The Hepatitis C Agreement Was Not a Reverse Payment....................................................10
         C.   The API Supply Agreement Was Not a Reverse Payment.....................................................11
         D.   The Emtriva Provisions Were Not a Reverse Payment. .......................................................12

III.     The Cartwright Act Does Not Apply Extraterritorially ...............................................................13

IV.      Plaintiffs' Unjust Enrichment and Unfair Competition Law Claims Fail .............................15

CONCLUSION.................................................................................................................................15

FILER'S ATTESTATION.................................................................................................................18

GILEAD AND CIPLA'S MOTION TO DISMISS (CASE NO: 4:20-CV-06522-JSW)

**TABLE OF AUTHORITIES**

**Cases**                                                                                              **Page(s)**

*In re Actos End Payor Antitrust Litig.*,
2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015), *aff'd in part, vacated in part*, 848 F.3d 89 (2d Cir. 2017)............................................................................................................10

*In re Aerovias Nacionales de Colombia, S.A. Avianca*,
323 B.R. 879 (Bankr. S.D.N.Y. 2005).......................................................................................7

*Apotex, Inc. v. Cephalon, Inc.*,
321 F.R.D. 220 (E.D. Pa. 2017)................................................................................................12

*AT&T Mobility LLC v. AU Optronics Corp.*,
707 F.3d 1106 (9th Cir. 2013) ..................................................................................................14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 555 (2007)....................................................................................................................3

*California v. Texas*,
141 S. Ct. 2104 (2021)................................................................................................................4

*In re Capacitors Antitrust Litig.*,
106 F. Supp. 3d 1051 (N.D. Cal. 2015) ...................................................................................14

*In re Cipro Cases I & II*,
61 Cal. 4th 116 (2015) ...............................................................................................................4

*Del Vecchio v. Del Vecchio*,
195 N.Y.S.3d 32 (2023)..............................................................................................................8

*Fed. Trade Comm'n v. AbbVie Inc*,
976 F.3d 327 (3d Cir. 2020).................................................................................................9, 10

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ...................................................................................................7

*Great Minds v. Office Depot, Inc.*,
945 F.3d 1106 (9th Cir. 2019) ...................................................................................................3

*Kolling v. Dow Jones & Co.*,
187 Cal. Rptr. 797 (Ct. App. 1982) ...........................................................................................4

*In re Lipitor Antitrust Litig.*,
868 F.3d 231 (3rd Cir. 2017) ........................................................................................9, 10, 11

*Lorenzo v. Qualcomm Inc.*,
603 F. Supp. 2d 1291 (S.D. Cal. 2009)......................................................................................4

GILEAD AND CIPLA'S MOTION TO DISMISS (CASE NO: 4:20-CV-06522-JSW)

**TABLE OF AUTHORITIES (CONT'D)**

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)...................................................................................................14

*Romero v. Flowers Bakeries, LLC*,
    2016 WL 469370 (N.D. Cal. Feb. 8, 2016) ............................................................15

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ..................................................................................15

*Stromberg v. Qualcomm Inc.*,
    14 F.4th 1059 (9th Cir. 2021) ...........................................................................14, 15

*Sullivan v. Oracle Corp.*,
    51 Cal. 4th 1191 (2011) ..........................................................................................13

**Statutes**

Cartwright Act ..................................................................................................4, 12, 13, 14

Hatch-Waxman Act ....................................................................................................12

**Rules**

Federal Rules of Civil Procedure Rule 12(b)(6)............................................................1, 3

**Other Authorities**

United States Constitution Article III ...............................................................................4

GILEAD AND CIPLA'S MOTION TO DISMISS (CASE NO: 4:20-CV-06522-JSW)

The Court dismissed Plaintiffs' Second Amended Complaint ("SAC") because Plaintiffs failed to allege plausible a theory of injury. The Court noted that Plaintiffs' allegations that Cipla, or any other generic manufacturer, intended to seek approval for a co-packaged version of Truvada (TDF/FTC) were based on speculation and conjecture. The Court provided Plaintiffs one last opportunity to amend their Complaint to remedy that fatal flaw. Despite four attempts that Plaintiffs have now had to satisfy the requisite pleading standard, Plaintiffs' Third Amended Complaint ("TAC") fails to do so. The TAC still fails to provide any plausible allegations that Cipla or any other manufacturer *intended* to seek approval for a co-packaged version of Truvada. Accordingly, Plaintiffs' TAC should be dismissed with prejudice.

**STATEMENT OF ISSUES TO BE DECIDED**

The issue to be decided is whether the claims asserted in the TAC (ECF 126-3) should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

The TAC refers at various times to five different drugs by their brand name or active ingredients. Each active ingredient also has a commonly used abbreviation as summarized by the following chart:

| Stand-alone HIV Treatments | | |
|---|---|---|
| **Brand Name** | **Active Ingredient** | **Abbreviation** |
| Viread® | Tenofovir Disoproxil Fumarate | TDF |
| Emtriva® | Emtricitabine | FTC |
| **Fixed-Dose Combination HIV Treatments** | | |
| **Brand Name** | **Active Ingredients** | **Abbreviation** |
| Truvada® | TDF and Emtricitabine | TDF/FTC |
| Atripla® | TDF, Emtricitabine, and Efavirenez | TDF/FTC/ EFV |

**BACKGROUND**

## I.    PROCEDURAL HISTORY

Plaintiffs first filed a complaint on September 17, 2020 (ECF 1) followed by a First Amended Complaint ("FAC") on December 28, 2020. (ECF 41.) On August 19, 2022, this Court dismissed many of the state law claims but declined to dismiss the main reverse payment theories because "the terms of the settlement are not part of the record" such that under the *Actavis* standard, the "Trust and the Court must rely on" the complaint's allegations. (ECF 60 at 12, 16.) Plaintiffs subsequently filed a SAC. (ECF 63.) Defendants moved to dismiss the SAC, and, in conjunction with that motion, Defendants provided

the challenged settlement and license/supply agreements that form the basis of Plaintiffs' allegations. (ECF 77.)  Defendants argued, among other things, that Plaintiffs did not plausibly allege injury or antitrust standing. (*Id.* at 10.)

According to Plaintiffs' theory, but for the alleged large, unexplained reverse payment(s), Cipla would have sought (and obtained) approval from the FDA to sell a "co-packaged" generic version of Truvada—that is, a product containing two distinct tablets in a single package, with one tablet containing TDF, and one tablet containing FTC, the two active ingredients contained in a single tablet of Truvada, no later than January 2018.  The Court rejected this theory:

> Although Plaintiffs have provided greater factual support for the allegation that FDA approval of a co-packaged version of Truvada was a "virtual certainty," the Court concludes their allegations about whether Cipla, or any other generic manufacturer, intended to seek approval for a co-packaged version of Truvada are based on speculation and conjecture and are insufficient to plausibly allege their theory of injury.

(ECF 125 at 5.)  The Court provided Plaintiffs with "one final opportunity" to amend.  (ECF 125 at 6.) On September 26, 2023, Plaintiffs filed the TAC.  (ECF 126-3.)

## II.    AMENDMENTS IN THIRD AMENDED COMPLAINT

In the TAC, Plaintiffs revised twelve of the 176 paragraphs in the SAC:

- In paragraphs 1, 8, 54, and 65, Plaintiffs added a new alleged payment theory concerning exclusivity for a generic version of Emtriva.  These allegations do not concern Cipla's or any other manufacturers' intent to seek approval of a co-packaged version of TDF/FTC.

- In paragraphs 50-52, Plaintiffs added descriptions of the Gilead-Cipla settlement agreements.  These allegations do not concern Cipla's or any other manufacturers' intent to seek approval of a co-packaged version of TDF/FTC.

- In paragraphs 61 and 62, Plaintiffs added allegations concerning the terms of the Emtricitabine Agreement.[1] ███████████████████████████████████████████████████████

- In paragraph 63, Plaintiffs rephrased their alleged payment theory related to the Atripla license.  These allegations do not concern Cipla's or any other manufacturers' intent to seek approval of a co-packaged version of TDF/FTC.

---

[1] "Emtricitabine Agreement" will have the same meaning as in paragraph 50 of the TAC: The agreement Gilead and Cipla entered in to on or about July 28, 2014 that settled the lawsuit that Gilead had brought against Cipla for infringement of Gilead's patents on Emtricitabine ("FTC") and that gave Cipla a license to those patents. The Court can consider the settlement agreements between Gilead and Cipla (Exs. 2, 15) under the incorporation by reference doctrine, as it did in its Order granting the motion to dismiss the SAC. (ECF 125 at 4.)

- In paragraph 64, Plaintiffs rephrased their alleged payment theory related to Cipla's active pharmaceutical ingredient (API) supply rights.  These allegations do not concern Cipla's or any other manufacturers' intent to seek approval of a co-packaged version of TDF/FTC.

- In paragraph 66, Plaintiffs rephrased their alleged payment theory related to the hepatitis C licenses.  These allegations do not concern Cipla's or any other manufacturers' intent to seek approval of a co-packaged version of TDF/FTC.

(*See* Ex. 1 (redline of the SAC and TAC).)  That is the extent of the changes from the SAC to the TAC.  Notably, Plaintiffs did not add any allegations that: (a) Cipla ever took any step towards seeking approval of a co-packaged version of TDF/FTC, (b) Cipla ever expressed any interest in developing a co-packaged version of TDF/FTC, or (c) any other generic company was interested in, or sought approval for, a co-packaged version of TDF/FTC.  In other words, Plaintiffs' amendments do not address the fundamental issue for which the SAC was dismissed—that anyone intended to seek approval for a co-packaged TDF/FTC.  Regarding an issue that the Court did not reach in dismissing the SAC—whether there was a large, unexplained reverse payment(s)—Plaintiffs' allegations repeating their three original payment theories and adding a new payment theory—the six-month exclusivity grant for the generic equivalent of Emtriva—fail to plausibly plead the requisite large, unexplained reverse payment.

## LEGAL STANDARD

To survive a challenge under Rule 12(b)(6), "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 555 (2007); *see also Great Minds v. Office Depot, Inc.*, 945 F.3d 1106, 1109 (9th Cir. 2019).

## ARGUMENT

### I.    PLAINTIFFS STILL FAIL TO ALLEGE INJURY OR ANTITRUST STANDING

This Court dismissed the SAC because Plaintiffs' "theory of injury" "about whether Cipla, or any other generic manufacturer, intended to seek approval for a co-packaged version of Truvada are based on speculation and conjecture."  (ECF 125 at 5.)  The sparse new allegations in the TAC do not address Cipla's intent, and the lack of allegations regarding any other manufacturers' intent warrant dismissal on the same grounds.  Paragraphs 61 and 62, the only two amended paragraphs that arguably attempt to address Cipla's intent, have already been rejected by this Court, are not plausible, and are plainly insufficient.  The Court should dismiss the TAC for the same reason it dismissed the SAC but with prejudice.

## A.    Standing Requires that the Settlement Plausibly Caused the Alleged Injury.

At the most basic level, pursuant to the "Case" and "Controversies" requirement in Article III of the United States Constitution, a "plaintiff has standing only if he can allege personal injury fairly traceable to the defendant's allegedly unlawful conduct." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (internal quotations omitted).  Under the Cartwright Act, a plaintiff must show that the alleged injury was the proximate and direct result of the allegedly unlawful conduct.  *See Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1302 (S.D. Cal. 2009); *see also Kolling v. Dow Jones & Co.*, 187 Cal. Rptr. 797, 807 (Ct. App. 1982) ("The plaintiff in a Cartwright Act proceeding must show that an antitrust violation was the proximate cause of his injuries.").  In a reverse payment case, the California Supreme Court held that "a plaintiff challenging a reverse payment settlement must establish the settlement limits the challenging generic's entry." *In re Cipro Cases I & II*, 61 Cal. 4th 116, 151 (2015).  Here, Plaintiffs fail to meet this meet this burden because they do not plausibly allege that the challenged settlement restricted the launch of a co-packaged TDF/FTC or that Cipla or that any other generic even intended to seek approval to launch a co-packaged TDF/FTC product.  Thus, Plaintiffs continue to lack standing.

## B.    The Settlement Did Not Plausibly Cause the Alleged Injury.

The gravamen of Plaintiffs' latest Complaint is their allegation that "the terms of the Emtricitabine Agreement indicate that both Gilead and Cipla anticipated that Cipla would introduce a co-packaged TDF/emtricitabine product if Cipla were not prohibited from doing so."  (TAC ¶ 61.) ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (*Id.* at ¶¶ 61-62.)  According to Plaintiffs, the existence of these provisions "indicat[e] that in the absence of such an agreement, Cipla would have done so." (*Id.* at ¶ 62.)  Plaintiffs have three insurmountable problems.  First, the Court has already considered these allegations and rejected them as not evincing any intent.  Second, the Agreement does not actually restrict Cipla from so introducing a co-packaged product, and Plaintiffs' allegations rely on a contradictory reading of the Agreement that render their theory implausible.  Third, even accepting Plaintiffs' incoherent interpretation of the Agreement, there is no plausible allegation in the TAC that Cipla or any other company ***intended*** to pursue a co-packaged product.

- 4 -

### 1.    These Allegations Have Already Been Considered and Rejected.

Paragraphs 61 and 62 restate arguments that the Court has already considered and rejected. As summarized above, these paragraphs allege that the Emtricitabine Agreement "denied" Cipla a license for a co-packaged product and prohibited Cipla from challenging the licensed patents in pursuit of a co-packaged product. That is exactly what Plaintiffs argued in their opposition to Defendants' motion to dismiss the SAC. (*See* ECF 96-03 at 5-6 (stating the Agreement denied Cipla a license and prohibited them from challenging the patents); *see also* ECF 124 at 37-39 (Plaintiffs' oral argument that Cipla did not receive a license for a co-packaged TDF/FTC product and ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).) These allegations are as insufficient now as they were when the Court dismissed the SAC. Regardless, the language of the Agreement fatally undermines Plaintiffs' amended allegations because it did not restrain Cipla's ability to pursue co-packaged TDF/FTC.

### 2.    Plaintiffs' Interpretation of the Emtricitabine Agreement is Not Plausible.

Plaintiffs' new allegations about the Emtricitabine Agreement do not support their allegation of injury because the Agreement makes clear that, had Cipla wanted to pursue a co-packaged product, the Agreement was no impediment. Under the Agreement, Cipla was only restrained with respect to licensed products. Plaintiffs' allegation that Cipla did not receive a license for a co-packaged product and was restrained from pursuing one is simply not possible under the terms of the Agreement.

There are three relevant sections of the Emtricitabine Agreement:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[2]

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The symmetry of the defined terms used in the license (3.1) and the alleged restraints (3.3 and 3.4) demonstrates the fatal flaw in Plaintiffs' allegations: ▮▮▮▮▮▮▮▮▮

---

[2] Page citations to the Emtricitabine Agreement are to the internal page numbers, not the court-stamped ECF numbers.

Therefore, if a co-packaged product is not a licensed product, two conclusions follow: (1) Cipla is not contractually prohibited from making or selling it; and (2) Cipla is free to challenge any patents that may cover it. Plaintiffs' allegations in paragraphs 61 and 62 attempt to advance the contradictory, and implausible, allegation that co-packaged TDF/FTC falls within the defined term "FTC Generic Equivalent" in the restraint but does not fall within the identical defined term in the license.

. It is not plausible for Plaintiffs simultaneously to allege that Cipla *did not* receive a license for co-packaged TDF/FTC *yet was* prohibited

from pursuing co-packaged TDF/FTC.  The contradiction between paragraphs 61 and 62 is enough to render Plaintiffs' allegations implausible and worthy of dismissal.

Plaintiffs' allegation in paragraph 62 that a co-packaged product falls within the definition of "FTC Generic Equivalent" is both inconsistent with the contradictory allegation in paragraph 61 and refuted by Plaintiffs' later allegations. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Plaintiffs further allege that "the potential competitors to Truvada are the generic formulation of Truvada, and a copackaged formulation of Truvada."  (TAC ¶ 108; *see also* ¶ 110.)  Plaintiffs' allegations therefore establish that co-packaged TDF/FTC does not qualify as a generic version of Truvada.  Accordingly, co-packaged TDF/FTC does not fall within the "FTC Generic Equivalent," as Plaintiffs correctly allege in paragraph 61.

Plaintiffs' contradictory allegations violate the "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other." *In re Aerovias Nacionales de Colombia, S.A. Avianca*, 323 B.R. 879, 888 (Bankr. S.D.N.Y. 2005) (applying New York law, which governs the Agreement, *see* Ex. 2, § 6.3).  While courts typically accept allegations as true, "[t]he court need not… accept as true allegations that contradict matters properly subject to judicial notice…." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  The Emtricitabine Agreement is properly subject to judicial notice (ECF 125 at 4) and this Court need not accept as true Plaintiffs' contradictory interpretation.

The Emtricitabine Agreement did not restrict Cipla with respect to a co-packaged product and does not indicate anything about Cipla's intent to pursue such a product.  Plaintiffs' amended allegations in no way cure their theory-of-injury deficiency.

### 3.   Even if Accepted as True, the Allegations Are Insufficient.

This Court dismissed the SAC because it contained only speculation and conjecture regarding whether Cipla or any other generic manufacturer intended to seek approval for a co-packaged version of

TDF/FTC.  Plaintiffs' new allegations, contained in paragraphs 61 and 62, merely suggest that "in the absence of [the Emtricitabine Agreement], Cipla would have [launched a co-packaged TDF/FTC]." (TAC ¶ 62.)  That is pure speculation insufficient to meet Plaintiffs' pleading standard.  Besides those two paragraphs, there are no new allegations that any company was interested in a co-packaged product, and for good reason:  at the time of the Agreement, HIV treatment was moving towards increasing treatment adherence by decreasing, not increasing, the number of pills taken by patients each day.

Cipla, despite submitting multiple abbreviated new drug applications ("ANDAs") for Gilead products, never submitted anything to the FDA indicating it was interested in a co-packaged version of TDF/FTC.  For example, in 2007, Cipla submitted an ANDA to the FDA for single agent TDF (Viread). (*Id.* ¶ 47.)  In 2009, Cipla submitted ANDAs for single agent FTC (Emtriva), a fixed dose combination of TDF/FTC (Truvada), and a fixed dose combination of TDF/FTC/EFV (Atripla).  (*Id.*)  Cipla submitted four ANDAs to the FDA for different TDF and FTC products.  What Cipla did not do, as Plaintiffs admit, was seek "approval from the FDA to sell a copackaged emtricitabine/TDF drug (which would compete with Truvada), despite strong indications from the FDA that such an application would be approved." (*Id.* ¶ 63.)  Even when Cipla amended its ANDAs for TDF and FTC from Paragraph III to Paragraph IV certifications (*see* TAC ¶¶ 48, 53), it did not file any application whatsoever for a co-packaged product containing one tablet of TDF and one tablet of FTC.  Between Truvada's approval in 2004 and the Emtricitabine Agreement in 2014, the TAC contains no allegations that Cipla expressed any interest in seeking approval for a co-packaged TDF/FTC product.

Despite no evidence or allegations of Cipla's interest preceding the Agreement, Plaintiffs allege that "a copackaged equivalent of Truvada would have been the main drug that the prohibition on challenges to the emtricitabine patents was meant to address." (TAC ¶ 62.)  That is sheer speculation, which is undermined by the actual language of the Emtricitabine Agreement.  The Emtricitabine Agreement is governed by New York law.  (Ex. 2 at § 6.3.)  "[T]he best evidence of what parties to a written agreement intend is what they say in their writing." *Del Vecchio v. Del Vecchio*, 195 N.Y.S.3d 32, 37 (2023).  The Emtricitabine Agreement never once mentions co-packaged TDF/FTC and is not a plausible proxy for Cipla's intent regarding such product.  Even accepting Plaintiffs' contradictory

interpretation of the contract as true, Plaintiffs have failed to offer any plausible allegations that Cipla or any other manufacturer was interested in pursuing co-packaged TDF/FTC.

## II.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A LARGE, UNEXPLAINED REVERSE PAYMENT[5]

Even if the Court were persuaded that Plaintiffs have antitrust injury/standing to pursue their claims, their new allegations for each of the three original payment theories and the new payment theory— that the six-month exclusivity grant for the generic equivalent of Emtriva was a payment—do not cure Plaintiffs' failure to plausibly plead a large, unexplained reverse payment. Because the Court dismissed the SAC on standing grounds, it did not previously address these deficient allegations. Defendants summarize their arguments here and incorporate by reference the previous arguments advanced in their motion to dismiss the SAC. (*See* ECF Nos. 96 and 106.) Defendants also address a new alleged unexplained reverse payment that appears in the TAC.

### A.   The Atripla License Was Not a Reverse Payment.[6]

Plaintiffs first allege that Gilead made a "reverse payment" to Cipla by including within the Emtricitabine Agreement a license to Atripla. (TAC ¶ 63.) This argument flips *Actavis* on its head. Early entry settlements, like the Atripla license, are exactly what the court in *Actavis* said are not reverse payments, and what other courts have said are *per se* lawful. *Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 359 (3d Cir. 2020) ("[U]nder *Actavis*, 'an agreement does not run afoul of the antitrust laws' if it simply allows a generic company to enter a market before patent expiration…And it was reasonable for the Court to think this exception reflects the Supreme Court's view that such agreements are so often procompetitive they should be legal per se.").[7]

---

[5] In addition to facts stated in the SAC, the Court may consider (a) the Access Agreements (Exs. 4-10), Cipla-Teva API supply agreements (Exs. 11-12), the Gilead-Teva FTC Settlement Agreement (Ex. 14), and Cipla's Patent Certification and Exclusivity Statement regarding emtricitabine (Ex. 3) incorporated by reference in the TAC and (b) judicially noticeable public records from the Food & Drug Administration ("FDA"), U.S. Patent & Trademark Office (Ex. 3), and the public dockets of patent litigation of Gilead against Teva and Cipla (Ex. 13). *See* Defendants' Request for Judicial Notice in Support of Their Motion to Dismiss (filed concurrently with this motion).

[6] Plaintiffs' revisions in paragraph 63 of the TAC do not meaningfully change the allegations, but merely note that Plaintiffs allege the payment was "documented in the Emtricitabine Agreement."

[7] The facts of this case are distinguishable from the "separate drug" cases, *Lipitor* and *Abbvie*, cited by this Court when it ruled on the motion to dismiss the FAC. (ECF 60 at 13 (citing *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 263 (3rd Cir. 2017); *FTC v. Abbvie Inc.*, 976 F.3d 327, 356 (3rd Cir. 2020).) Neither of those cases involved an alleged payment consisting *only* of early entry, as we have here. In *Lipitor*,

---

- 9 -

Plaintiffs allege the entire suite of Atripla patents were not disputed when Cipla and Gilead settled. (TAC ¶ 63(d).)  However, prior to settlement, in March 2014, Cipla submitted a Paragraph IV certification to include the newly issued Atripla formulation patent (Ex. 3), which this Court has recognized, "automatically counts as patent infringement." (ECF 60 at 3.)  The fact that Gilead and Cipla decided to resolve both pending disputes rather than litigate to the last dollar or file new lawsuits is not anticompetitive.  Courts have dismissed cases challenging similar settlements.

The *Actos* case is instructive in this regard.  In *Actos*, two generic companies (Actavis and Ranbaxy) received early entry licenses to Actos, the product they had sued over, as well as over Actosplus, a product they had not challenged.  *See In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752, (S.D.N.Y. Sept. 22, 2015), *aff'd in part, vacated in part*, 848 F.3d 89 (2d Cir. 2017).  Plaintiffs in *Actos* raised the same argument that Plaintiffs raise here—that the Actosplus license was a reverse payment because Actavis and Ranbaxy could not have invalidated those patents in the subject litigation.  The court rejected the plaintiffs' argument, finding, "Both the early-entry ACTOS and ACTOplus licenses were permissible settlement terms under *Actavis*, and the simultaneous grant of both does not render either license unlawful." *Id.* at *17.

Cipla and Gilead had a dispute over the patents underlying multiple products.  In line with *Actos*, there is nothing anticompetitive about settling multiple disputes at the same time.

**B.     The Hepatitis C Agreement Was Not a Reverse Payment.**

Plaintiffs allege that the reverse payment could have consisted of a hepatitis C license and that, of the seven hepatitis C licenses granted by Gilead, only Cipla received lucrative active pharmaceutical ingredient ("API") rights.  (TAC ¶ 66.)  This Court held in its order regarding the FAC that "it is reasonable to infer that Cipla obtained those rights as part of the settlement with Gilead." (ECF 60 at 14.)  That inference is no longer plausible in light of the licenses the Court now possesses and of which it may take judicial notice.  (Exs. 4-10.)  Gilead granted licenses to seven different companies to make treatments for patients with hepatitis C in low-income countries—which is pro-competitive.  (*See id.*)  Importantly, the

---

plaintiffs alleged that Pfizer released a claim worth hundreds of millions of dollars in damages from Ranbaxy's at-risk launch. *Lipitor*, 868 F.3d at 253.  Likewise, in *Abbvie*, the alleged payment was more than early entry.  Abbott allegedly agreed to supply Teva needed components of ***another*** drug below fair market value. *Abbvie*, 976 F.3d at 357.

GILEAD AND CIPLA'S MOTION TO DISMISS (CASE NO: 4:20-CV-06522-JSW)

Cipla hepatitis C license contains identical commercial terms to the six other license agreements and were agreed to with companies with whom Gilead did not have patent disputes.[8]  (*Id.*)

Additionally, the Emtricitabine Agreement at issue here does not reference or overlap with the hepatitis C license.  Unlike in *Lipitor* or *Abbvie*, where the agreements were signed on the same day, the Emtricitabine Agreement and hepatitis C agreements were signed months apart.  Additionally, the hepatitis C agreement was signed by Gilead Sciences Ltd., which is not a defendant here and not a signatory to the Emtricitabine Agreement.  (*See* Ex. 4.)  Plaintiffs' link between the hepatitis C license and the settlement is simply speculation contradicted by the facts and insufficient to state a claim.

### C.    The API Supply Agreement Was Not a Reverse Payment.

Plaintiffs allege that "through rights granted by the Emtricitabine Agreement, Cipla won an exclusive contract to supply APIs to Teva for its production of generic Truvada, Atripla, and Viread." (TAC ¶ 64.)  The Court did not address this supply agreement in its original order.  But again, the API supply agreements (Exs. 11 & 12) put an end to that theory, as there is no causal connection between the Emtricitabine Agreement and Cipla's supply of API to Teva.[9]  Three years before the Emtricitabine Agreement, Gilead believed Cipla was supplying TDF API to Teva in support of Teva's TDF ANDA and Cipla was identified in Teva's ANDA as the initial API source for Teva's TDF product.  (*See* Ex. 13.)  As part of the Emtricitabine Agreement, Gilead gave Cipla a broad right to sell API—again, a procompetitive act.  The fact that the Emtricitabine Agreement allowed Cipla ***to continue*** supplying API to Teva makes clear that Gilead did not create that relationship in the first place.  Gilead was simply not involved—the Cipla-Teva supply agreements do not include Gilead as a party, do not reference Gilead in any way, and do not claim Cipla had an exclusive right to supply the API to others.  (*See id.*) ██████████

██████████████████████████████████████

████████████████████████████████ Once Teva received a license from Gilead, Teva was free to source its API supply from anyone it wanted. Nothing in the Emtricitabine Agreement, the Gilead-Teva Settlement, or the supply agreements state that

---

[8] One of the agreements—with an API supplier that does not sell generic drugs—included fewer terms (as some did not apply) but was otherwise identical to the Gilead-Cipla agreement.  (Ex. 10.)

[9] Notably, Plaintiffs seem to recognize the weakness of the causal relationship.  Revisions to this theory of payment in the TAC deleted the allegation that "Gilead arranged for Cipla to be the exclusive API supplier to Teva for its generic production" of Truvada and Atripla.  (SAC ¶ 59(i).)

- 11 -

Cipla was the exclusive supplier to Teva. (*See* Exs. 2, 11-13.) Plaintiffs cannot plausibly transform the commercial agreement between Cipla and third-party Teva into a reverse payment by Gilead to Cipla.

**D.    The Exclusivity Period in the Emtricitabine Agreement Was Not an Unexplained Reverse Payment.**

The TAC adds a new theory for an unexplained, reverse payment, namely, that "the Emtricitabine Agreement gave Cipla a six-month exclusivity period for generic Emtriva" [*i.e.*, emtricitabine aka FTC]. (TAC ¶ 65.) But Plaintiffs' own allegations explain this six-month period of so-called "exclusivity." Plaintiffs acknowledge that "Cipla was the first to submit an ANDA for Emtriva with a Paragraph IV certification" and that consequently "the FDA could not issue final approval for any other ANDA until 180 days after Cipla had begun marketing a generic version of Emtriva." (TAC ¶ 57.) In other words, Cipla's ANDA filing made it eligible for the six months of exclusivity afforded to the first generic applicant under the Hatch-Waxman Act. Plaintiffs do not allege, and cannot allege, that Cipla forfeited this statutory exclusivity. Thus, the "six-month exclusivity period" in the Emtricitabine Agreement was simply a contractual acknowledgement that, as a *statutory* matter, Cipla could launch six months before any other ANDA licensee. The agreement did not give Cipla anything it was not already eligible to receive—indeed, statutory exclusivity under the Hatch-Waxman Act is a *broader* privilege than Gilead could grant by contract (even hypothetically).[10] *See Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 236 (E.D. Pa. 2017) ("there is nothing inherently anticompetitive about first filer exclusivity.").

Dismissal of all of Plaintiffs' claims is therefore appropriate here for lack of a reverse payment.

**III.    THE CARTWRIGHT ACT DOES NOT APPLY EXTRATERRITORIALLY**

While all of Plaintiffs' claims fail for the reasons above, Plaintiff John Doe's California Cartwright Act claim (Count I) also fails with respect to purchases made outside of California.

---

[10] For example, the Hatch-Waxman Act prohibits competitors from launching "at-risk" (*i.e.*, upon receipt of FDA approval, but before the conclusion of any patent infringement litigation) during the first-filer's 180 days of statutory exclusivity. Gilead did not (and could not) grant a similar protection by contract: the acceleration clause that Plaintiffs describe as a "payment" did not accelerate Cipla's entry date if a third party launched at risk. Moreover, neither the statute nor the agreement granted Cipla exclusivity if Gilead allowed a third party to launch pursuant to an authorized generic license (an alternative to an ANDA license).

*First*, applying the Cartwright Act to out-of-state purchases would violate California's statutory presumption against extraterritorial application of its laws. *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011) (the California Supreme Court "presume[s] the Legislature did not intend a statute to be operative, with respect to occurrences outside the state [] unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history"); *In re HIV Antitrust Litig.*, 19-cv-2573 (N.D. Cal. Sept. 27, 2022), ECF 1452-7 at 14 (applying *Sullivan* to a Cartwright Act claim). There is "no indication that the California legislature intended to invite [potential] conflict [with other states' laws] through extraterritorial application of the Cartwright Act." *Id.* At 15. Plaintiffs' sole basis for applying California law to half the country is that "Gilead decided in California, its headquarters state, to enter into the anticompetitive agreements, and it is more likely than not it entered into the Settlement and License Agreement in California, as the executives with authority to enter into such an agreement work at Gilead's headquarters in California." (TAC ¶ 54.) Given the basis for antitrust violations in the TAC, which primarily involve agreements between Gilead and Cipla, an Indian company based in India (Cipla Ltd.) and a Delaware company based in Florida (Cipla USA Inc.), the mere fact that Gilead is based in California is not enough to overcome the presumption of against extraterritorial application.[11]   Under similar facts, Judge Chen declined to extend California's Cartwright Act to extraterritorial claims, noting:

> And presumably, Gilead, which is based in California, made its part of the agreements to restrain trade from California. This tie to California, however, is weakened by two facts: (1) the other parties to the agreements, including Janssen, are not based in California, and (2) the agreements to restrain trade concerned purchases/reimbursements in the non-California repealer states.

*In re HIV Antitrust Litig.*, 19-cv-2573 (N.D. Cal. Sept. 27, 2022), 1452-7 at 15.

*Second*, as a matter of due process, California law cannot be applied extraterritorially in a class action unless California has a sufficiently significant aggregation of contacts to the claims asserted by each putative class member such that applying California law would be neither arbitrary nor unfair. *See,*

---

[11] Some allegations reach even further afield and have no alleged connection to California whatsoever. The hepatitis C license that was supposedly a part of the anticompetitive payment was between Gilead Sciences Limited, an Irish corporation with its principal place of business in Ireland, and Cipla Ltd., an Indian company with its principal place of business in India. (*See* Ex. 4.) Another alleged payment—the API deal between Cipla and Teva (a company headquartered in Israel)—also has no alleged connection to California. (*See* Ex. 11.)

*e.g., In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1073-74 (N.D. Cal. 2015) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985) (striking "all references to a nationwide class in indirect purchasers' claims under California's Cartwright Act").  Here, the challenged agreement was not accepted in California, and the only parties connected with California are Gilead, which is a Delaware corporation with its principal place of business in California, and John Doe.  (ECF 77 at 18.)  Those contacts do not provide a "sufficient aggregation of contacts needed for due process for purchases outside of California."  *Capacitors*, 106 F. Supp. 3d at 1074 (striking nationwide class under California law where complaint "alleges hardly any contacts at all with the state of California").[12]

Additionally, it is appropriate for the Court to dismiss claims under the Cartwright Act brought by non-California purchasers at the pleading stage.  *See In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015) (granting defendant's motion to dismiss where plaintiffs' assertion of California law on behalf of a nationwide class would be unconstitutional and impermissible).  Plaintiffs' TAC citation to *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059 (9th Cir. 2021) is not to the contrary.  (TAC ¶ 139.)  There, the Ninth Circuit reversed a district court's certification of a nationwide class under the Cartwright Act, holding that the Cartwright Act cannot apply to plaintiffs whose injuries occurred in other states with materially different legal regimes, because to do so would run afoul of the predominance requirement for class certification.  *Stromberg*, 14 F.4th at 1065, 1074.  While *Stromberg* addressed this

---

[12] While the leading Ninth Circuit case applying the due process test to the Cartwright Act applied the law to purchases outside of California, the case is distinguishable.  *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1109 (9th Cir. 2013).  Sufficient California connection was established in *AT&T* because "Plaintiffs offered **significant detail** as to what conspiratorial conduct took place in California."  *Id.* at 1109 (emphasis added).  Plaintiffs in that case alleged "that **specific employees** of particular Defendants, **operating** from offices **in California, participated in illegally obtaining and sharing** their co-conspirators' pricing information."  *Id.* (emphasis added).  Moreover, plaintiffs alleged that "Defendants **engaged in and implemented their conspiracy** in the U.S. through the offices they maintained **in California**, and **that Defendants entered into agreements** to fix the prices of LCD panels **in California**."  *Id.* (emphasis added).  Plaintiffs' single conclusory allegation about Gilead's presence in California is not even close to alleging a similar constellation of facts that lead to a finding of a "significant aggregation of contacts" to satisfy due process.  First, they identify no specific employees operating in California that carried out the purported conduct.  Second, Plaintiffs sued three defendants:  an Indian company based in India (Cipla Ltd.), a Delaware company based in Florida (Cipla USA Inc.), and a Delaware company based in California (Gilead).  Plaintiffs offer no connection between two of the three defendants and any anticompetitive conduct in California.  They also ignore that the settlement agreements involved and were signed by a third entity—Emory University, a non-profit entity based in Georgia.  (Ex. 2.)  Finally, as is obvious on the face of the settlement agreement, those agreements related to litigation in the state of New York, were governed by New York law, and the key result of those agreements was a stipulation of dismissal entered in New York.  (Exs. 2 & 15.)

issue at class certification, it does not hold that it cannot be resolved at the pleading stage and does not address the legal arguments raised in this motion. *See id.* at 1068 ("Qualcomm does not dispute there are sufficient contacts in California.").

## IV. PLAINTIFFS' UNJUST ENRICHMENT AND UNFAIR COMPETITION LAW CLAIMS FAIL

Count II for violation of California's UCL and Count III for unjust enrichment should be dismissed because Plaintiffs have not alleged an inadequate remedy at law, a required element. Count III also independently warrants dismissal because Plaintiffs have not put Defendants on notice as to which state laws are at issue.

*First*, "equitable relief is not appropriate where an adequate remedy exists at law." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). Here, Plaintiffs affirmatively bring damages claims in Counts I and IV under the laws of California and Florida, and therefore cannot claim an inadequate remedy at law. (TAC ¶¶ 136-142, 171-176.) According to Plaintiffs, "damages suffered" number in the "hundreds of millions of dollars." (TAC ¶ 115.) Plaintiffs' claims in equity must therefore be dismissed. *Sonner.*, 971 F.3d at 844 (affirming dismissal of claims in equity where "[plaintiff] fails to explain how the same amount of money for the exact same harm is inadequate or incomplete").

*Second*, Plaintiffs "must identify which state's or states' law they rely upon" in order to put Defendants on adequate notice of the claims against them. *Romero v. Flowers Bakeries, LLC*, 2016 WL 469370, at *12 (N.D. Cal. Feb. 8, 2016) ("[D]ue to variances among state laws, failure to allege which state law governs a common law claim is grounds for dismissal."). Plaintiffs' naked assertion that "all states' unjust enrichment laws are substantially similar" (TAC ¶ 169) does not save its unjust enrichment claim from dismissal.

## CONCLUSION

For the foregoing reasons, the TAC should be dismissed with prejudice.

Respectfully submitted,

Dated:  October 31, 2023              KIRKLAND & ELLIS LLP

By:    */s/ Jay P. Lefkowitz*

- 15 -

Jay P. Lefkowitz, P.C. *(pro hac vice)*
Devora W. Allon, P.C. *(pro hac vice)*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
lefkowitz@kirkland.com
devora.allon@kirkland.com

Michael J. Shipley (SBN 233674)
KIRKLAND & ELLIS LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
Tel: (213) 680-8400
michael.shipley@kirkland.com

*Attorneys for Defendant Gilead Sciences, Inc.*

By:    */s/ Peter Giunta*

Jason Haycock (SBN 278983)
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: 415-882-8200
Facsimile: 415-882-8220
Jason.Haycock@klgates.com

Peter Giunta *(pro hac vice)*
K&L Gates, LLP
599 Lexington Avenue
New York, NY 10022
Telephone: 212-536-3900
Facsimile: 212-536-3901
Peter.Giunta@klgates.com

Philip Van Der Weele *(pro hac vice)*
Elizabeth White (SBN 291439)
K&L Gates LLP
One SW Columbia St., Suite 1900
Portland, OR 97204
Telephone: 503-228-3200
Facsimile: 503-248-9085
Phil.Vanderweele@klgates.com
Elizabeth.White@klgates.com

*Attorneys for Defendants Cipla Ltd. and Cipla USA Inc.*

- 16 -

**FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(h)(3), regarding signatures, I, Jay P. Lefkowitz, attest that concurrence in the filing of this document has been obtained.

Dated:  October 31, 2023                              */s/ Jay P. Lefkowitz*

GILEAD AND CIPLA'S MOTION TO DISMISS (CASE NO: 4:20-CV-06522-JSW)

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2023, I caused to be filed the foregoing document with the United States District Court for the Northern District of California using the CM/ECF system and caused it to be served on all registered participants via notice of electronic filing and by emailing a copy of the moving papers and any documents filed under seal to counsel for Plaintiffs.

*/s/ Jay P. Lefkowitz*

GILEAD AND CIPLA'S MOTION TO DISMISS (CASE NO: 4:20-CV-06522-JSW)